86 F.3d 364
 29 Bankr.Ct.Dec. 329
 In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.
Paul W. BERGSTROM; A. Russell Blank; Thomas J. Brandi;
Mari C. Bush; William D. Cook; Peter Danziger; Glenn A.
Dorfman; J. Michael Egan; Paul E. Fagan; Michael Fields;
Joseph S. Friedberg; Michael Friedman; William C. Gage;
Abraham N. Goldman and Associates, Limited; Jeffrey Holl;
James B. Hovland; Arthur C. Johnson; Charles Johnson;
Rodney A. Klein; Martina Langley; Edward C.Y. Lau; Stan
Linker; Henri E. Norris; Ralph Pittle; Michael A. Pretl;
Ron Schnieder; Gregory J. Semanko; Sybil Shainwald;
Andrew S. Zieve, Appellants,
v.
DALKON SHIELD CLAIMANTS TRUST, Trust-Appellee.
In re A.H. ROBINS COMPANY, Incorporated, Debtor.
Glenn A. DORFMAN, Appellant,
v.
DALKON SHIELD CLAIMANTS TRUST, Trust-Appellee.
In re A.H. ROBINS COMPANY, Incorporated, Debtor.
MEDICAL LEGAL CONSULTANTS OF WASHINGTON, Appellant,
v.
DALKON SHIELD CLAIMANTS TRUST, Trust-Appellee.
In re A.H. ROBINS COMPANY, Incorporated, Debtor.
LEVIN, FISHBEIN, SEDRAN & BERMAN, Appellant,
v.
DALKON SHIELD CLAIMANTS TRUST, Trust-Appellee.
In re A.H. ROBINS COMPANY, Incorporated, Debtor.
Michael R. TUCKER, Appellant,
v.
DALKON SHIELD CLAIMANTS TRUST, Trust-Appellee.
 Nos. 95-2239, 95-2032, 95-2033, 95-2236, 95-2240.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 6, 1996.
Decided June 20, 1996.
 
 ARGUED: Benjamin C. Ackerly, Sr., Hunton & Williams, Richmond, Virginia, for Appellants. John Calvin Jeffries, Jr., University Of Virginia School Of Law, Charlottesville, Virginia, for Appellee. ON BRIEF: Lewis T. Booker, Tyler P. Brown, Hunton & Williams, Richmond, Virginia, for Appellants. George A. Rutherglen, University Of Virginia School Of Law, Charlottesville, Virginia; Orran Lee Brown, Richmond, Virginia, for Appellee.
 Before RUSSELL and WIDENER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 Affirmed by published opinion. Senior Judge CHAPMAN wrote the opinion, in which Judge RUSSELL and Judge WIDENER joined.
 OPINION
 CHAPMAN, Senior Circuit Judge:
 
 
 1
 Four hundred years ago William Shakespeare observed that lawyers "dream on fees."* During the ensuing centuries, few lawyers, even in their wildest dreams, have envisioned fees such as those that have resulted from mass tort litigation. This appeal is taken by 29 attorneys, who have represented claimants seeking recovery from the Dalkon Shield Claimants' Trust (Trust) for injuries sustained because of the use of the intra-uterine contraceptive device known as the Dalkon Shield and manufactured and marketed by A.H. Robins Company, Inc. (Robins). These 29 appellants-attorneys have already received fees in excess of $90,000,000 on claims that have been paid to their clients in excess of $270,000,000. Because claims of other clients are still pending, these amounts will increase.
 
 
 2
 It now appears certain that the Trust will have a sizable amount remaining after payment of all claims, and under its terms, claimants who received more than the de minimis amount of $750 will receive an additional payment or pro rata distributions with no additional effort by the claimants or by their attorneys. This additional payment will be as much as 75 percent of the original settlement amount for each claimant and may approach 100 percent, thereby doubling the settlement heretofore made. The district court, sitting in bankruptcy after having retained jurisdiction over the administration of the settlement of the Dalkon Shield claims, has limited attorneys' fees on these additional pro rata payments to ten percent. The appellants claim that the district court lacks jurisdiction to enter such an order and that there was no factual basis to support a reduction of their contingent fees from one-third or more to only ten percent of these additional funds. The total amount of additional fees to be collected by the 29 appellants based on a 75 percent pro rata payment would be $19,875,000, if the court's limit of ten percent is sustained. If the appellants receive a fee of one-third of the new payments, they will obtain additional fees in excess of $66,000,000. Under the district court's order, the 29 attorneys will have received total compensation of $110,000,000 resulting from the Dalkon Shield litigation, but they are appealing and assert that the district court has deprived them of due process of law by not allowing them to collect an additional $46,000,000. We find no merit to the appellants' contentions, and we affirm.
 
 I.
 
 3
 From early 1971 to 1974, Robins manufactured and sold worldwide an intra-uterine contraceptive device known as the Dalkon Shield. Manufacture and sale of this device stopped because of complaints and law suits of women claiming injuries arising out of its use. These law suits continued to multiply until the company was overwhelmed with the effort and the expense of defending and settling claims and paying judgments in state and federal courts throughout the land and in foreign countries. In August 1985, Robins filed a petition under Chapter 11 of the Bankruptcy Code. This stayed all suits against the company.
 
 
 4
 While attempting to reorganize under Chapter 11, Robins managed its affairs and operated its businesses as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108 with oversight by a court-appointed examiner. After extensive negotiations, a plan of reorganization dated March 28, 1988 (Plan), was filed accompanied by the Sixth Amended and Restated Disclosure Statement pursuant to § 1125 of the Bankruptcy Code. Under this Plan, Robins was merged into a subsidiary of American Home Products Corporation (AHP). The Plan created the Claims Resolution Facility (CRF), a Claimants' Trust and Other Claimants' Trust which were funded by AHP in the amount of $2.475 billion to pay the valid Dalkon Shield claims. Each Trust is non-reversionary, and the entire corpus and all interest and income earned thereon must be used to pay claims and the costs of administration. Each Trust is charged with the responsibility of evaluating each claim and deciding what amount, if any, to award the claimant. Any funds remaining after all claims and expenses have been paid is to be distributed pro rata to claimants in lieu of punitive damages, which are not otherwise available under the Plan. These pro rata payments will go to those claimants who did not accept Option 1, which provided quick settlement for minor claims and paid $725 on minimal proof of Dalkon Shield use and injury.
 
 
 5
 From the beginning, the United States District Court for the Eastern District of Virginia retained jurisdiction of most issues arising out of this bankruptcy and the United States District Judge and the United States Bankruptcy Judge have been sitting together and deciding those legal issues that have been presented. The district court has retained continuing supervision of the CRF and the Trust.
 
 
 6
 There has been great concern and difference of opinion as to the amount of money that would be required to fund the Trust so as to pay all valid claims and cover the cost of administration. Prior to approving the amount to be placed in the Trust, the district court, sitting in bankruptcy, heard expert testimony as to the total recovery value of all Dalkon Shield claims. The expert opinions ranged from 600 million dollars to 7 billion dollars. Attorneys for the claimants appealed the district court's finding that $2.475 billion would be sufficient, because their experts had insisted on a figure of 4.2 to 7 billion dollars.
 
 
 7
 We affirmed the district court's amount in In re A.H. Robins Co., 880 F.2d 694 (1989), cert. denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). The funds were contributed to the Trust by American Home Products, and the Trust began to pay claims. From the beginning, the Trustees were fearful that the money would not be sufficient and requested the district court to enter Administrative Order No. 1 of July 1, 1991, which included a hold back provision which provided in part:
 
 
 8
 ... In order to assure the continued availability of funds to pay all valid Dalkon Shield personal injury claims, and in order to further the other proper purposes of the plan, Trust and CRF, in satisfaction of all awards and judgments ... obtained as a result of Arbitration or Litigation, the Trust shall
 
 
 9
 a. Pay initially only that portion of such award or judgment which does not exceed the greater of $10,000 or the final settlement offer made by the Trust under Option 3, Section E.4 of the CRF....
 
 
 10
 (Paragraph 13 of Administrative Order No. 1.)
 
 
 11
 Certain claimants appealed, and we approved this order In re: A.H. Robins, Inc., 42 F.3d 870, 872 (1994). At the same time, the Trustees also held back their compensation because of their concern as to the sufficiency of funds. However, as settlement of claims progressed, the need for such hold backs no longer existed and all amounts held back from payments to claimants have now been restored and paid in full.
 
 
 12
 The record reflects that the Trustees have done an excellent job of administration. They have minimized administrative expenses, engaged excellent financial consultants, and earned over $800,000,000 by investing the Trust funds. They have also set in place an effective regimen for evaluating and paying the valid claims of persons who suffered from use of the Dalkon Shield. The Claims Resolution Facility was designed:
 
 
 13
 to provide all persons full payment of valid claims at the earliest possible time consistent with the efficient design and implementation of the Claims Resolution Facility. This purpose is to be achieved by (1) providing an efficient economical mechanism for liquidating claims which favors settlement over arbitration and litigation thereby reducing transaction costs, (2) providing claimants with an attractive alternative to trial by jury where settlement is not achieved, (3) providing fair and equitable compensation based upon historic values, updated by current developments, to persons injured by the Dalkon Shield, and (4) providing no compensation to persons not injured by the Dalkon Shield. The Trustees shall, as practicable, design and implement a facility for resolution of Dalkon Shield claims. The facility is to be designed and operated in accordance with the guidelines set forth below. (CRF-1 Purpose.)
 
 
 14
 The CRF gave claimants three options. Most claimants chose Option 1 (Short Form/Instant Offer) which provided a quick settlement of $725 on minimal proof of Dalkon Shield use and injury. This option disposed of more than 119,000 claims.
 
 
 15
 Option 2 (Claim Form/Tailored Offer) permitted claimants
 
 
 16
 who elect to do so, to receive a specified payment in accordance with a schedule. The schedule shall include specified settlement amounts for each of the injuries on Exhibit A hereto. In addition, the Trustees may prepare a schedule that varies the award for the same injuries according to the type and volume of documentation the claimant submits.
 
 
 17
 Recovery under this option was limited to $5,500. (CRF-2.)
 
 
 18
 Option 3 (Complete Form/Early Evaluation/Offer/Arbitration/Trial) provided that:
 
 
 19
 the claimant shall submit (1) a completed claimant information form, (2) all Medical Records of any injuries and damages alleged to have resulted from use of the Dalkon Shield by a claimant, and (3) Medical Records or Medical Evidence regarding use of a Dalkon Shield by the claimant or an affidavit of the claimant stating that she used the Dalkon Shield and explaining the basis of this knowledge. (CRF-2.)
 
 
 20
 Option 3 claims were evaluated by developing a profile of the claim based upon criteria relevant to the case value, by comparing the profile to corresponding profiles based upon historical data, and by establishing an amount at which the comparison of the claimant's profile and quality of evidence supported the claim.
 
 
 21
 Option 3 provided that as soon as practicable the Trust would mail to the claimant a statement of the amount, if any, which the Trust offered to pay in satisfaction of the claim and the report setting forth the reasons therefor. Option 3 offers were non-negotiable and were extended to the claimant as a "best and final offer and not an opening bid."
 
 
 22
 If settlement was not reached on the original offer, the Trust would undertake an in-depth review of the claim and invite the claimant and claimant's representative to a voluntary settlement conference or any other voluntary alternate dispute resolution process as appropriate. If settlement was not reached at this level, then the claimant was to select either binding arbitration or a trial. (CRF-3.)
 
 
 23
 The use of these options resulted in the settlement of the vast majority of the claims promptly, economically, and with low transaction costs. CRF designed and tested claim forms that were understandable to claimants, whether or not represented by counsel. Claimants were provided with instructions, newsletters, and telephone numbers to call for assistance. The claimants were advised early on to begin collecting their medical records and other evidence of injury and damage.
 
 
 24
 Under rules adopted by the Trust, claims were evaluated and paid on information submitted. These procedures reduced the role of the claimants' attorneys to the point that they were involved in finding the client, assembling the medical records, bills and other evidence of damage and transmitting these documents to CRF. In a small percent of the claims, attorneys represented clients who proceeded to binding arbitration or trial.
 
 
 25
 Option 3 was quite successful. The offers made by CRF had an overall acceptance rate of 84 percent. Of the offers over $20,000, 96 percent were accepted and 99 percent of offers over $60,000 were accepted.
 
 
 26
 The average Option 3 settlement was $33,150 for claimants who were not represented by counsel. Of claimants who were represented by counsel, the average payment under Option 3 was $39,047. All claimants who have settled by accepting offers from CRF have signed general releases acknowledging that their settlement covered all claims. All amounts paid through alternate dispute resolution, arbitration or trial have been paid as full settlement of all claims. None of these payments that were made, nor any of the releases that were signed, mentioned or held out any hope of additional payments or a pro rata distribution of any excess that might remain in the Trust.
 
 
 27
 The appellants-attorneys have not been restricted in any way in collecting their contingent fees from their clients on all payments heretofore made through the CRF. As of March 31, 1995, the Trust had paid out in excess of 1.3 billion dollars to settle 173,321 claims. On that date, the Trust had 1.4 billion dollars in assets to cover the remaining 19,000 claims. At this point it became obvious that there would be a large pro rata distribution as directed by Section G.14 of the CRF which provides:
 
 
 28
 Claimants who have claims for contingent damages which are meritorious and which are not time-barred shall have first call on the funds in the Trust. To the extent funds remain after all such claims are paid in full, meritorious compensatory damage claims which are time-barred shall then be administered and paid from the funds of the Trust. To the extent funds (not including Aetna Insurance) remain after such claims are paid in full, the remaining funds shall be paid in lieu of punitive damages to all claimants (other than holders of Dalkon Shield Liquidated Claims) who receive compensatory damage awards from the Trust, on a pro rata basis consistent with such awards. The Trustees may, in their discretion, set a de minimis amount below which such payments need not be made.
 
 
 29
 The Trustees directed that all claimants who received more than the $725 under Option 1 would participate in the pro rata distribution. Each claimant will receive, without further effort by the claimant or claimant's attorney, a pro rata payment of an additional sum estimated to be 75 percent or more of the original settlement received by such claimant. These excess funds result largely from the $800,000,000 earned on investments and the control of administrative costs which were $200,000,000 less than originally projected.
 
 
 30
 The district court received quarterly reports from the Trust and was kept aware of progress in settling claims and of amounts being expended. Based upon these reports, which showed a large excess likely to remain after payment of all valid claims, and being aware of the pro rata provisions of Section G.14, the district court entered its March 1, 1995 order which provided in part:
 
 
 31
 No additional effort will be required of the claimants or their counsel to receive the pro rata distribution. Over the years of the Trust's existence, the court has also received numerous complaints from claimants and others regarding the level of fees charged to claimants, but has avoided in becoming entangled in such disputes.
 
 
 32
 In light of the foregoing, the court has reviewed the issue of whether it would be reasonable for the attorneys representing Dalkon Shield claimants to charge and receive additional attorneys' fees out of the pro rata distribution. On the basis of this analysis, in the exercise of this court's retained jurisdiction, it is ORDERED and ADJUDGED as follows:
 
 
 33
 1. The Court's Authority to Regulate Fees. The court's authority to supervise members of the bar, its inherent powers to regulate attorney-client relations and compliance with ethical standards by attorneys, the equitable powers of the court under 11 U.S.C. § 105(a) and the inherent equitable powers of the court, render the contingent fee contract of attorneys representing Dalkon Shield subject to the supervision of this court to ensure that excessive or unreasonable fees are not charged or recovered by counsel.
 
 
 34
 2. Allowance of Unreasonable Attorneys' Fees Out of the Pro Rata Distribution. The court has determined, based on the foregoing, that attorneys' fees charged by counsel to Dalkon Shield claimants out of any pro rata distribution by the Trust under § G.14 of the CRF in excess of ten percent of the pro rata distribution would be unreasonable and thus are hereby disallowed. Unless reinstated under the terms of this order, counsel for Dalkon Shield Personal Injury Claimants are prohibited from charging or receiving, directly or indirectly, any compensation or fees, based upon or out of any pro rata distribution received by a Dalkon Shield Personal Injury Claimant from the Trust under § G.14 of the CRF, in excess of ten percent of such pro rata distribution by the Trust to the claimant (with such disallowed fees referred to hereinafter in this order as "Disallowed Fees").
 
 
 35
 3. Objection to Disallowance. Any attorney representing the Dalkon Shield Personal Injury Claimant who objects to this disallowance and wishes to seek reinstatement of his or her claim to disallowed fees must follow all of the procedures set out in the remainder of this order.
 
 
 36
 The court provided a process for seeking reinstatement of larger contingent fees and set a hearing on April 27, 1995 on any motions for reinstatement of fees in excess of ten percent.
 
 
 37
 This order was mailed directly to 10,984 attorneys, who appeared on the records of the Trust as having represented Dalkon Shield claimants. Of this number, 76 filed motions to reinstate their original contingent fees. Prior to the April hearing, attorneys for the present 29 attorneys-appellants filed a motion to vacate the March 1 order. At the hearing of April 27, 1995, the March 1, 1995 order was treated as a Rule to Show Cause as to why the attorneys' fees on any pro rata distribution should not be limited to ten percent.
 
 
 38
 At the April 27 hearing, the district court invited the appellants to present any evidence they desired, but their counsel replied that none would be presented. The Trust then called Georgene M. Vairo, Associate Dean and Professor of Law at Fordham University School of Law. She is and, since 1988, has been the chairperson of the Trustees administering the Dalkon Shield Claimants' Trust. She testified at length about the activities of the Trust, the CRF, settlement of claims, amounts paid, excess expected, investment results, etc. She was subjected to cross examination. She also presented various charts and figures concerning the payment of claims and the administration of the Trust.
 
 
 39
 On May 2, 1995, the district court issued its order denying the motion to vacate the March 1 order and the request to reinstate fees. On May 22, 1995, the district court found that its prior orders as to fees were final and appealable. The present appellants then appealed.
 
 II.
 
 40
 The appellants raised the following exceptions: (1) the bankruptcy court lacked jurisdiction to enter the March 1 order; (2) the procedure set forth in the March 1 order violated due process; (3) the bankruptcy court's March 1 order improperly modified the plan and amended the Trust; (4) the bankruptcy court lacked any evidentiary basis for the factual conclusions contained in the March 1 and May 2 order; and (5) the bankruptcy court erred in applying the reasonableness test set forth in Barber v. Kimbrell's Inc., 577 F.2d 216 (4th Cir.), cert. denied, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978) solely to work that will be performed by claimants' attorneys in obtaining the pro rata distribution, rather than to all the work performed by the attorneys throughout the representation of their clients.
 
 
 41
 A. Jurisdiction under Title 28 U.S.C. § 1334.
 
 
 42
 The jurisdictional question presented in this appeal is reviewed de novo. Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 865 (4th Cir.1994). Appellants argue that the district court lacked jurisdiction under § 1334 to enter its March 1, 1995 order, which interferes with the appellant's contingent fee arrangements with their clients. Section 1334(b) provides:
 
 
 43
 Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
 
 
 44
 The present question concerning the amount of the attorneys' fees to be charged and collected on the pro rata distribution to claimants out of the Trust, subsequent to the claimants having already been paid and their attorneys having collected contingent fees out of such prior payments and settlements of their claims, is a matter "arising in" and "related to" a case under Title 11.
 
 
 45
 Proceedings "arising in" Title 11 are those proceedings that "are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy." Matter of Wood, 825 F.2d 90, 97 (5th Cir.1987).
 
 
 46
 The "related to" category of cases is quite broad and includes proceedings in which the outcome could have an effect upon the estate being administered under Title 11. Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984).
 
 
 47
 [T]he proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedoms of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.
 
 
 48
 Id.
 
 
 49
 We have held that the "related to" jurisdiction is to be "broadly interpreted." See In re Johnson, 960 F.2d 396, 403 (4th Cir.1992).
 
 
 50
 The present proceeding or controversy arises in Title 11, and the district court has jurisdiction because it "would have no practical existence but for the bankruptcy." The A.H. Robins Title 11 bankruptcy produced the Trust and the CRF, which established the expedited procedures required to process and pay almost 200,000 claims from all over the world. This unusual bankruptcy resulted from worldwide use of a product by hundreds of thousands of women and made it possible for the attorneys to advertise for clients in publications of general interest to women. The three options for handling cases and the use of claimants' profiles and "best and final offers" that were nonnegotiable allowed the CRF to handle thousands of claims promptly and also made it possible for appellant-attorneys to represent a multitude of claimants without expending the time, effort and resources that would have been required to try individual cases or to negotiate individual settlements in the usual "offer and counter offer" way.
 
 
 51
 Without the bankruptcy, there would have been no pro rata distribution. This is unique to this bankruptcy proceeding. The district court's order limiting the percent that the plaintiffs' may receive in fees out of these pro rata distributions could not have occurred but for the bankruptcy and, therefore, said order "arises in" the bankruptcy, and the court has jurisdiction under § 1334(b).
 
 
 52
 The court also has jurisdiction under the same section because the proceeding is "related to" a case in bankruptcy, and the proceeding could have an effect on the estate being administered. The appellants-attorneys argue that there is no jurisdiction under the "related to" prong because there is no estate being administered, only the Trust remains. This argument is too restrictive. A.H. Robins has gone out of existence, but the Dalkon Shield Claimant Trust has taken its place, and all claims against Robins have been transferred to the Trust, and the Trust is obligated to discharge these obligations. The bankruptcy case remains open until all claims have been paid and the Trust dissolved under its terms. The present controversy could have an effect on the operation of the Trust, and it impacts its handling and administration and is therefore "related to" the bankruptcy within the meaning of § 1334(b).
 
 
 53
 The disallowance of excessive attorneys' fees to be collected from the unexpectedly large pro rata distribution is a matter related to the administration of the Trust because it affects the amount that each claimant will receive. The Trust was created to protect and pay those persons who had been damaged by use of the Dalkon Shield. The efforts of the Trust to settle the remaining claims could easily be affected if the remaining claimants are aware that any attorneys' fees out of the pro rata distribution will be limited to ten percent. In 1991, when it appeared that funds in the Trust may not be sufficient to pay all claims, we approved the district court's supervision of the Trust and the entry of the order holding back any award or judgment in excess of $10,000. See In re A.H. Robins Co., Inc., 42 F.3d 870 (4th Cir.1994). Proceedings to hold back payments or to make additional payments in the form of the pro rata distribution both relate to the administration of the bankruptcy and support jurisdiction.
 
 
 54
 We find no merit to the appellants' argument that once the plan was confirmed, the district court lost jurisdiction. Under § 8.05 of the Plan and the order of July 26, 1988 confirming the Plan, the district court retained exclusive jurisdiction to resolve controversies and disputes regarding interpretation and implementation of the Plan. In numerous appeals, we have disallowed challenges to the district court's supervision of the Trust. See In re A.H. Robins Co., Inc., 42 F.3d 870 (4th Cir.1994); In re A.H. Robins Co., Inc., 880 F.2d 769 (4th Cir.1989); and In re A.H. Robins Co., Inc., 880 F.2d 779 (4th Cir.1989).
 
 
 55
 Appellants also challenge the authority and jurisdiction of the district court to limit their fees. They are a little late with this argument because the law of this circuit has long been clear that federal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount. In Allen v. United States, 606 F.2d 432 (4th Cir.1979), we concluded:
 
 
 56
 The district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established. Dunn v. H.K. Porter Co., 602 F.2d 1105, 1108 (3d Cir.1979), succinctly restates the general principles pertaining to this authority:
 
 
 57
 Because contingency fee agreements are of special concern to the courts and are not to be enforced on the same basis as are ordinary commercial contracts, Spilker v. Hankin, 88 U.S.App. D.C. 206, 210, 188 F.2d 35, 39 (D.C.Cir.1951), courts have the power to monitor such contracts either through rule-making or on an ad hoc basis. Canon 13 of the Canons of Professional Ethics, promulgated by the American Bar Association, recognizes that an attorney is free to enter into such arrangements. The Canon, however, qualifies the right with the proviso that they are subject to the "supervision of the courts, as to [their] reasonableness." See Fitzgerald v. Freeman, 409 F.2d 427 (7th Cir.), cert. denied, 396 U.S. 875, 90 S.Ct. 151, 24 L.Ed.2d 134 (1969) (court not bound by contingent fee agreement executed in conjunction with substitution of new counsel and could, in light of Canons 13 and 34, award fees on quantum meruit basis). We indicated the source of the power in Schlesinger v. Teitelbaum, 475 F.2d 137, 141 (3d Cir.), cert. denied, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973), where we stated that, "in its supervisory power over the members of its bar, a court has jurisdiction of certain activities of [its] members, including the charges of contingent fees."
 
 
 58
 * * *
 
 
 59
 We also reject the argument advanced by counsel for the plaintiffs that a court can do no more than enforce the terms of the contingent fee contract. Associated with the court's power to allocate part of the recovery to counsel is its obligation to limit the fee to a reasonable amount. A court abuses its discretion if it allows a fee without carefully considering the factors relevant to fair compensation. Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir.1978).
 
 
 60
 Id. at 435.
 
 
 61
 In the present case, the district court, acting upon its extensive knowledge of this litigation, of the facts presented at the hearing concerning the settlement process, of the first and final offer being made by the Trust after comparing a claimant's case with the profile of others similarly situated, and of the unexpectedly large pro rata distribution, simply applied the settled principle that attorneys' fees must be reasonable. The court had this clear authority. This authority is so clear that it is not necessary to discuss the additional sources of such authority such as the federal court's power to enforce state law standards of ethical conduct and a federal district court's inherent power to regulate the conduct of the court's officers, including attorneys.
 
 
 62
 B. Due Process.
 
 
 63
 We find no merit to the argument that the procedure set forth in the March 1, 1995 order of the district court denied the appellants-attorneys due process. Although the order was issued sua sponte, the record is clear that the attorneys and the court treated this order as a Rule to Show Cause as to why the attorneys' fees on the pro rata distributions should not be limited to ten percent. There was ample notice of the April 27, 1995 hearing at which the attorneys could respond to the Rule to Show Cause. They were given the opportunity to present evidence in support of their position and to cross examine Professor Vario. The court heard legal argument from the appellants in support of their position. The attorneys had sufficient time to prepare for the hearing, and although they presented no evidence and confined themselves to legal argument, this was their choice, freely made.
 
 
 64
 The appellants requested and received a stay of individual motions for reinstatement of fees pending a decision on this appeal. At that time they will have the opportunity to present evidence to support a claim for a larger fee based upon the facts in particular cases.
 
 
 65
 It was not a violation of due process for the district court to place upon the appellants-attorneys the burden of proving that their one-third contingent fees from the pro rata distributions were reasonable.
 
 
 66
 An attorney has the burden of proof as to the reasonableness of his fee when he sues to recover from his client. This allocation of the burden of proof is premised on the relationship of trust owed by a lawyer to his client, with concomitant obligation to charge only a reasonable fee whether the arrangement be contingent or otherwise. This approach is at the very heart of the special relationship between attorney and client.
 
 
 67
 McKenzie Construction, Inc. v. Maynard, 758 F.2d 97, 100 (3d Cir.1985).
 
 
 68
 Although this is not a suit between an attorney and a client as to the reasonableness of a fee, the burden of proof remains with the attorney to establish reasonableness. The March 1, 1995 order of the district court found that a number of claimants had complained to the court about the level of attorneys' fees being charged. This finding supported the Rule to Show Cause and justified the district court in placing the burden of proving reasonableness upon those seeking additional millions of dollars in fees in this unusual situation where clients are receiving additional amounts without any additional legal services being rendered by the attorneys.
 
 
 69
 C. Modification of Plan by the District Court Order of March 1, 1995.
 
 
 70
 Appellants contend that the district court's March 1, 1995 order improperly modified the confirmed Plan and amended the Trust, because the order affects the division of Plan funds between a claimant and her attorney. They argue that the Plan was the result of extensive negotiations and approved by a vote of the creditors, and as such it may not be modified after it has been substantially consummated. They cite 11 U.S.C. § 1127(b):
 
 
 71
 The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.
 
 
 72
 They assert that the Plan has been substantially consummated and that the guidelines governing the Claims Resolution Facility provide:
 
 
 73
 8. Costs. The Trust and the claimants shall each bear their own costs, expenses, and attorneys' fees in connection with the claims resolution process, except as provided otherwise by law.
 
 
 74
 Appellants read too much into § 1127(b). This section does not take away the power of the district court to review attorneys' fees charged in a bankruptcy proceeding, nor does it take away the power to issue such orders as may be appropriate to carry out the provisions of the Bankruptcy Act. Under 11 U.S.C. § 105, a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." A court also retains the post-confirmation power to issue an order necessary to the administration of the estate. See Federal Bankruptcy Rule 3020(d).
 
 
 75
 The limitation of attorneys' fees from the pro rata distribution is not a modification of the bankruptcy Plan. There is no conflict between the limitation on fees and the Plan itself. The Plan need not be rewritten or modified because of the March 1 and May 2 orders, and nothing in the language of the CRF concerning costs, expenses and attorneys' fees can reasonably be construed as forbidding the district court from exercising its inherent power to prevent unreasonable fees. This language simply provides that claimants shall pay their own attorneys' fees, but does not, under any stretch of the imagination, say that their fees may be unreasonable or that the question of fees is not subject to judicial supervision.
 
 
 76
 This section also states that the claimants shall bear their attorneys' fees "in connection with the claims resolution process, except as provided otherwise by law." (emphasis added) This language subjects the matter of fees to the general law and the district court's powers in this field of law.
 
 
 77
 The March 1 and May 2 orders did not impermissibly modify the Plan but were entered in aid of the Plan and the CRF as provided by § 8.05(d) of the Plan itself.
 
 
 78
 D. Evidentiary Basis for Factual Conclusions in the March 1,
 
 
 79
 1995 and the May 2, 1995 orders.
 
 
 80
 Appellants challenge the factual findings and conclusions of the district court in its two orders limiting attorneys' fees to ten percent of the pro rata distribution. Under Federal Rule of Civil Procedure 52, factual findings of the court are reviewed for clear error. "[F]indings of fact will be affirmed unless our review of the entire record leaves us with the definite and firm conviction that a mistake has been committed." Harman v. Levin, 772 F.2d 1150, 1153 (4th Cir.1985).
 
 
 81
 Appellants contend that the March 1 order had no evidentiary basis because no evidence had been presented on the issue of claimants' attorneys' fees at that time. This order contains statements that the court was aware of the degree of legal assistance required to receive compensation from the Trust, that the court assumed that attorneys' fees were mostly paid on a contingent basis, that no additional effort would be required of the claimants or their attorneys to receive the pro rata distribution, that the court had received numerous complaints from claimants about the level of attorneys' fees charged, and that fees in excess of ten percent would be considered unreasonable. In the May 2 order, the court reiterated factual findings of the March order and found that excess funds were available for pro rata distribution because of the unexpectedly large number of claimants settling under Option 1, because the assets of the Trust were wisely invested, and because the Trust had limited its operating and administrative expenses and had diligently monitored the claims resolution process.
 
 
 82
 The appellants also complain that the district court found that the initial recovery received by claimants represented full compensation for their injuries and that the pro rata distribution was a bonus. The appellants object to the court's finding that throughout the Robins bankruptcy, a relatively small number of lawyers have represented a very large number of claimants and the lawyers have been handsomely paid considering the low risk levels involved and the routine for representing claimants under the CRF process.
 
 
 83
 The appellants-attorneys also assert that the large amount remaining in the Trust demonstrates that the Trustees were overzealous in preserving the Trust assets by making low settlement offers to the claimants and that the funds now available should have already been distributed. The attorneys argued that they bargained for and expected to participate in a pro rata distribution. This is a rather unseemly argument coming from attorneys who previously contended that the $2.47 billion in the Trust was inadequate and should be raised to as much as $7 billion and that the possibility of a pro rata distribution was highly unlikely. See In re A.H. Robins, Inc., 880 F.2d 694, 700 (4th Cir.1989) (in which we held that the district court's finding of $2.475 billion to cover the claims was not clearly erroneous).
 
 
 84
 The above challenged findings of fact are not clearly erroneous. This has been one of the most complex bankruptcy proceedings ever to come before a federal court and involves several hundred thousand claims from all over the world. The district judge and the bankruptcy judge have been sitting together in all matters arising under the Plan and the Trust and have been very diligent in their overall supervision of this case. They have expended great time and effort in trying to see that all valid claims are promptly paid. They have urged the attorneys into new areas and procedures in an effort to achieve the best results for those injured by the product. This has required the judges to be constantly aware of how successful the CRF has been in settling claims, how much money has been spent, how many claims remain, how the settlement options were working, whether the funds were going to be sufficient, what type of proof was being required to support the claims and thereby what type and degree of legal services were required from claimants' attorneys. Quarterly reports informed the court of the millions of dollars in fees being collected by attorneys without the risk usually accompanying products liability litigation. They also had the benefit of the testimony and exhibits presented by Professor Vairo. With this record and their ten years of constant contact with this bankruptcy, they have made findings of fact in the March 1 and May 2 orders which we find not to be clearly erroneous.
 
 
 85
 E. Fee Determination.
 
 
 86
 Appellants contend that the district court erred in the manner in which it reviewed their fees and its determination that any amount above ten percent of the pro rata distribution would be unreasonable. They assert that the district court did not conduct the reasonableness inquiry mandated by this court in Barber v. Kimbrell's Inc., supra, because it did not consider each of the twelve factors enumerated, it heard no evidence in its inquiry, it considered only the work that would be performed by the attorneys in connection with the pro rata distribution, rather than the totality of the work performed, it did not properly consider "the nature and length of the professional relation ship between attorney and client" and the "attorneys' expectations at the outset of the litigation," it failed to consider the "total time and labor expended," and whether cases were settled under Options 2 and 3 or by arbitration or trial, and it did not consider whether the cases involved foreign or domestic claimants.
 
 
 87
 First, there is a serious question as to whether Barber applies to this inquiry into the reasonableness of a contingent fee. Barber is a fee shifting case, and in it we were concerned that the district courts consider the twelve factors before assessing an attorney's fee against a party, who had not employed said attorney and had lost the litigation because of said attorney's efforts. There we sought to protect a party from an unreasonable fee sought by an opposing counsel. In the present case, the district court sought to protect a party from an unreasonable fee sought by her own counsel.
 
 
 88
 This appeal is best considered under Allen v. United States, supra, because it deals with contingent fees and places upon the district court the obligation to limit such fees to a reasonable amount.
 
 
 89
 Second, if Barber is applicable, the district court considered those factors of the litany that are applicable to the present fee determination, and the district court is under no obligation to go through the inquiry of those factors that do not fit. See EEOC v. Service News Co., 898 F.2d 958, 965 (4th Cir.1990) ("From the record, factors (3), (4), (6), (7), (9), (10) and (12) do not seem to affect the fee in this case.")
 
 
 90
 Third, the appellants are not in a good position to complain about lack of evidence and the failure of the court to consider all of the time and effort they expended, because they introduced no evidence of what they had done that would justify the additional millions of dollars in fees they seek. They were given the opportunity to present evidence at the April 27 hearing, but they declined.
 
 
 91
 "[W]e have recognized that because the district court has 'close and intimate knowledge of the efforts expended and the value of the services rendered, [the fee award] must not be overturned unless it is "clearly wrong." ' " Plyler v. Evatt, 902 F.2d 273, 278 (4th Cir.1990).
 
 
 92
 In the present case, the district court had a much longer and more intimate knowledge of the efforts and value of attorneys' services than is usual because the court has been closely involved in this litigation and has supervised the administration of the CRF since its inception. The court heard the evidence presented to the effect that the vast majority of the claims were settled under one of the CRF options, the services of the attorneys were unusual in that few claims went to arbitration or trial. Most claims did not require the extensive preparation or the uncertainty of outcome that accompanies normal litigation and is used to justify contingent fees. The court was also aware that all of the claimants who would share in the pro rata distribution had already settled their claims and been paid. The court could reasonably assume that the plaintiffs had already collected a one-third contingent fee from their clients' settlement and would collect a similar percent from the pro rata distribution. The plaintiffs put up no evidence to show a different fee arrangement although they had the burden of proof as to reasonableness.
 
 
 93
 Fourth, this litigation and appeal are wonderful examples of chutzpah. To merely examine the numbers would bring any reasonable person to the conclusion that based on the entire record, a ten percent attorneys' fee from the pro rata distribution is not only reasonable, but overly generous. The total fees already collected are staggering, but additional millions are to be received. Obviously, more than 10,000 claimants' attorneys thought the additional ten percent fee was reasonable, because they have not asked for reconsideration nor joined in the appeal.
 
 
 94
 To put the entire matter in perspective, we will examine what one of the plaintiff's attorneys has already received, what he will receive under the district court's order and what he seeks. We also will look at these amounts in the light of hourly charges for legal services. While we realize that hourly fees and contingent fees are different, the example below is helpful to put the numbers in perspective. Also, the fees at issue are no longer contingent on anything. They are certain.
 
 
 95
 This firm has received approximately $54,754,000 in settlements, and with the normal contingent fee of one-third would have produced over $18,000,000 in fees. The pro rata distribution is estimated to be in excess of 75 percent, and using this figure an additional $41,000,000 in settlements will come through this law office. Under the district court's order, these attorneys will collect an additional $4,100,000 in fees, but they are demanding $13,700,000 which would result in total fees to this office of over $30,000,000.
 
 
 96
 If the total fee ($22,000,000), fees already received plus the ten percent under the district court's order, is considered at an hourly rate of $300 (a very high rate), it would require 70,000 hours of work to produce. An attorney would have to live as long as Methuselah to bill so many hours.
 
 CONCLUSION
 
 97
 Appellants argue that in reviewing an attorney's fee for reasonableness, the court must consider the total work performed by the attorney together with the total fee received. We do not disagree with this proposition, but whether the attorneys' efforts in the present case are viewed as a whole or in segments, the attorneys have been handsomely compensated. They are fortunate that there was no cross-appeal asserting that the fee of ten per cent of the pro rata distribution was unreasonably high, when considered with the fees already received and the total services rendered and results obtained.
 
 
 98
 Appellants have the temerity to contend that they negotiated for and approved the Plan in reliance upon the potential of a pro rata distribution without any limitation on attorneys' fees, when the history of this litigation reflects that they argued from the creation of the Plan that the Trust was dreadfully under funded and would be insufficient to pay all claims. Plaintiffs are well aware that the surplus was not expected, and the provision of pro rata distribution was put into the Plan to prevent any surplus from being returned to the company. Without such provision, there would have been the constant claim that the CRF was being administered in an overly frugal way, and claimants were being short changed, so as to increase the surplus going back to the company.
 
 
 99
 When the district court realized that there would be a very sizable distribution and had received complaints from Dalkon Shield claimants about the unreasonably large attorneys' fees being collected, the court had the obligation to investigate. This investigation convinced the court that the fees exceeding ten percent on the pro rata distribution would be unreasonable and this finding is not clearly erroneous. The court has the jurisdiction and authority to remedy the situation, and its remedy was reasonable, legal and within its discretion.
 
 
 100
 We have carefully considered the other exceptions raised by the appellants and find them to be without merit.
 
 
 101
 AFFIRMED.
 
 
 
 *
 Romeo and Juliet, Act 1, Scene 4