# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01775-COA

IN THE MATTER OF THE ESTATE OF LEE               APPELLANTS
HOUSE BURFORD, DECEASED: GINGER
RICHARDS AND KIMBERLY ARCHER, AS CO-
MANAGERS OF THE BLACKBURN FIRM LLC

v.

WALTER WENDELL FREEMAN, EXECUTOR          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/06/2017 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | TATE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | HARRIS H. BARNES III |
| | JAMES WILLIAMS JANOUSH |
| | S. GRAY EDMONSON |
| ATTORNEYS FOR APPELLEE: | JOHN THOMAS LAMAR III |
| | TAYLOR ALLISON HECK |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 04/16/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. This case concerns an employment contract between an attorney and his client. We must decide whether the chancery court erred by cancelling the contract due to the attorney's death and ordering compensation for the attorney's firm on a quantum meruit basis. Finding no error, we affirm.

## FACTS

¶2. In 2008, Lee House Burford entered into an employment contract with Barry C.

Blackburn for legal services. The contract stated as follows:

> THIS AGREEMENT, made this 4th day of June, 2008, at Olive Branch, Mississippi, by and between LEE HOUSE BURFORD, hereinafter referred to as "Client," and BARRY C. BLACKBURN of THE BLACKBURN LAW FIRM, PLLC, hereinafter referred to as "Attorney."
>
> Client retains Attorney to represent him as his Attorney at law in connection with his estate plan and the administration of his estate, including but not limited to preparation of estate planning documents, consultations, updates/revisions, and the formal administration of his estate upon his demise including assistance with Client's revocable living trust. Therefore, Client and Attorney have agreed that Attorney shall receive a fee of Two Hundred and Sixty-Five Thousand Dollars ($265,000.00) for his services rendered from his estate upon his demise. Further, client empowers him to institute all legal action as may be advisable in his judgment.

¶3.     Additionally, both Burford and Blackburn agreed that the contract "shall bind their estates, successors and assigns, whether so expressed or not, and shall inure to the benefit of the successors and assigns of Client and Attorney." The contract also contained a clause that entitled Blackburn to reasonable attorney's fees if he had to file suit to collect his fees owed under the contract. The contract was signed by both parties and notarized.

¶4.     About six years after the contract was signed, Blackburn passed away. Prior to his death, Blackburn had conveyed the Blackburn Law Firm (BLF) into a revocable living trust. Ginger Richards and Kimberly Archer, the managers of BLF and executors of Blackburn's estate, established an account on behalf of BLF to collect money owed and pay outstanding debts. The managers also changed the name of BLF to The Blackburn Firm LLC (the Firm). Archer stated that Jason Bailey, a local attorney, helped her and Richards file the petition to

2

probate Blackburn's estate.[1]  The record includes the order accepting Blackburn's will for probate and granting letters testamentary.  Bailey prepared and submitted the order. Blackburn's will also contained a clause requesting that his executors hire Bailey to administer Blackburn's estate.  There is nothing in the record to suggest that Burford cancelled or rescinded the contract for services—a fact that the attorney for Burford's estate conceded during oral argument.

¶5.    Burford died in February 2015.  On behalf of Walter Freeman, the executor of Burford's will, Bailey filed a probate petition in the Tate County Chancery Court.[2]  The managers subsequently filed a probate claim against Burford's estate for the contracted sum of $265,000.  Freeman objected to the claim.  In their response to Freeman's objection, the managers conceded that Blackburn did not handle the formal administration of Burford's estate and that a reduction in the amount owed to Blackburn would be appropriate based upon the costs associated with probating Burford's estate.

¶6.    After a hearing, the chancery court found that the contract between Burford and Blackburn was cancelled due to the impossibility of performance, i.e., Blackburn's death. The chancery court ruled that "Blackburn's duties under the contract were clearly spelled out and he was unable to come close to performing those duties due to his death."  The chancery court concluded that the Firm was entitled to collect fees from Burford's estate on a quantum meruit basis.  During the hearing, Archer had produced two documents listing the scheduled

[1] Archer testified that Bailey had been interested in buying BLF but ultimately moved out of state.

[2] Bailey later withdrew as counsel.

3

meetings and the list of estate-planning documents drafted for Burford. Based upon these documents, the chancery court found that Blackburn had documented performing thirty-six hours of work for Burford prior to Blackburn's death. The chancery court then determined that a $250 per-hour fee was reasonable for the work performed and awarded the Firm $9,000.

¶7. The Firm now appeals, arguing several issues that we have condensed as follows: (1) the contract was valid and should be enforced as written; (2) even if quantum meruit was the proper basis, then the amount awarded should be based on the amount stated in the contract; and (3) attorney's fees should have been awarded according to the contract.

## STANDARD OF REVIEW

¶8. This Court will not disturb a chancery court's findings of fact unless they are manifestly wrong or clearly erroneous or unless the chancellor applied an erroneous legal standard. *Ainsworth v. Ainsworth*, 139 So. 3d 761, 762 (¶3) (Miss. Ct. App. 2014). However, we review a chancellor's conclusions of law de novo. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009). Questions involving the construction and interpretation of contracts are questions of law that we review de novo. *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (¶4) (Miss. 2003).

## DISCUSSION

### I. The contract was not fully performed.

¶9. The Firm argues that a valid contract existed between Burford and Blackburn and that it must be automatically paid the $265,000. The contractual terms stated that the agreement

4

was "between Lee House Burford, hereinafter referred to as 'client,' and Barry C. Blackburn *of* the Blackburn Law Firm PLLC, hereinafter referred to as 'attorney.'" (Emphasis added). The terms refer to Blackburn individually and not the Blackburn Law Firm. All sides agree that Blackburn performed his duties under the contract for over six years prior to his death. This contract is in the nature of a personal-services contract, and not a contract with the attorney's firm.

¶10.    While Burford's estate strenuously argues that the contract for personal services itself is invalid due to the amount of the fee, we do not need to reach that question, as we find that the contract was unable to be completed after Blackburn's death due to the impossibility of performance. Performance of a contract is excused by "the illness or death of the promisor who contracted to render personal services." *Miller v. Parker McCurly Properties LLC*, 36 So. 3d 1234, 1240 (¶12) (Miss. 2010); *accord Baptist Mem'l Hosp.-N. Miss. Inc. v. Lambert*, 157 So. 3d 109, 114 (¶¶12-13) (Miss. Ct. App. 2015) (discussing a physician who received a medical diagnosis that he was no longer fit to practice medicine and was excused from performing a contract due to the doctrines of impossibility and impracticability). "Where a contract is made with an attorney, and it is specially contracted or understood that he alone is to do the work or to render the services, or that his skill exclusively is depended upon, then the death of the attorney terminates the contract, whether he be alone or a member of a firm." *Clifton v. Clark*, 83 Miss. 446, 6 So. 251, 253 (1904). Blackburn agreed to perform a series of estate-related services for Burford for a set fee, but Blackburn died prior to completing his express obligations under the contract.

¶11. Although the Firm brought in another attorney to handle the estate administration expressly contracted-for in the agreement, the contract was for Blackburn to perform the estate administration personally—not his firm or another attorney. As a result, Bailey could not fulfill the contract in Blackburn's stead. Nor did Bailey ever join Blackburn's firm or purchase the firm after Blackburn's death. As a result, the contract cannot be enforced to grant the Firm the full amount. The chancery court's ruling on this point is affirmed.

## II.  Quantum meruit provided a basis for compensation.

¶12. Since we agree that the contract could not be completed due to impossibility of performance, we must determine whether the chancery court properly awarded the Firm on a quantum meruit basis. "Quantum meruit recovery is a contract remedy which may be premised either on express or 'implied' contract, and a prerequisite to establishing grounds for quantum meruit recovery is claimant's reasonable expectation of compensation." *In Re Estate of Fitzner*, 881 So. 2d 164, 173 (¶25) (Miss. 2003). The essential elements of recovery under a quantum meruit claim are:

> (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, [and] used and enjoyed by him; and (4) under such circumstances as reasonably notified [the] person sought to be charged that [the] plaintiff, in performing such services, was expected to be paid by [the] person sought to be charged.

*Id.* at 173-74.

¶13. There is no doubt that Blackburn did perform services for Burford under the contract and should receive compensation as a result. Yet the Firm protests that it was entitled to much more than the $9,000 that the chancery court awarded, and argues that the chancery

6

court failed to consider the uncontradicted testimony that Blackburn performed more work for Burford than the records indicated.

¶14.  As set out above, all sides agree that Blackburn provided services under the contract for almost six years.  Archer, who was Blackburn's paralegal during this time period, was the sole witness at the hearing, and much of her testimony focused on the wide-ranging work Blackburn performed for Burford during the six years between the formation of the contract and Blackburn's death.  "Undisputed testimony, which is not so unreasonable as to be unbelievable, must be taken as truth." *Reeves Royalty Co. Ltd. v. ANB Pump Truck Serv.*, 513 So. 2d 595, 599 (Miss. 1987).  For "in the absence of contradictory evidence, courts are bound to accept the only credible evidence offered in a proceeding and apply the correct law." *MSU v. PETA*, 992 So. 2d 595, 607 (¶20) (Miss. 2008).

¶15.  However, Archer only introduced one document listing the number of scheduled meetings between Blackburn and Burford at the office, and another document listing the number of estate-planning documents drafted for Burford.  She also testified that much of the work performed by Blackburn—either meetings, conferences, or phone calls—was not documented due to the nature of the contract.  According to Archer, Burford called Blackburn on his cell phone "all the time" and would frequently "pop in" at the office.  Burford also went to Blackburn's house "quite often."  Likewise, Blackburn met with Burford after office hours and on the weekends.  She also stated that Blackburn "changed [Burford's] documents quite a bit," and she said, "I would say maybe monthly, certainly."  She then said that due to a "volatile relationship with another gentleman [Burford] would

7

want to change his documents every time he changed his clothes."

¶16.     In addition to the estate planning specifically set out in the contract, Blackburn performed other legal work for Burford, including a real estate closing and an insurance claim on a car wreck. Archer's testimony indicated that Blackburn undertook this additional legal work under the auspices of the contract. The uncontested evidence was clear that Blackburn substantially performed his duties under the contract. The chancery court saw fit to compensate the Firm based solely on the recorded events and the testimony of the paralegal and at a rate of $250 per hour, which Archer testified was within the range of Blackburn's hourly rate of $250 to $375.

¶17.     Under our standard of review, the chancery court's factual determinations must be affirmed unless there was manifest error. The chancery court heard the paralegal's testimony, reviewed the documents, and considered the scope of the work performed. Ultimately, the chancery court was in the best position to weigh the evidence of quantum meruit compensation. While not every case will be the same, or turn on compensation based upon a record of work performed by the hour, in this instance we cannot say the chancery court committed manifest error.

¶18.     The Firm also urges that it could have been compensated by a percentage agreement. However, the contract for personal services did not contain such a clause, and we will not draft one for the parties. There was evidence in the record that Blackburn had used such a percentage clause for compensation in at least one other contract, but did not do so in the one at hand. Our rule of contracts has long been that specificity may prevent headaches at a later

date because "the answer to the objection of hardship in all such cases being that it might have been guarded against by a proper stipulation." *Piaggio v. Somerville*, 119 Miss. 6, 80 So. 342, 344 (1919). To the extent that the Firm is frustrated that it did not recover a greater fee despite the attorney's service over many years, the contract was not segmented in a way to grant compensation per year, per task, or on a percentage basis. We cannot say the chancery court committed any error in ruling upon the contract presented to us.

¶19. For this same reason the Firm is not entitled to further fees and costs for its efforts to recover compensation per the contract. As set out above, the contract failed due to impossibility of performance. The chancery court considered the language of the contract, weighed the evidence, and allowed the Firm to recover based upon the testimony and documents produced into evidence at trial. We find there was no error on this point.

¶20. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY C. WILSON, J.; McDONALD, J., JOINS IN PART. CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

**J. WILSON, P.J., CONCURRING:**

¶21. I concur that the decision and judgment of the chancery court should be affirmed based on the doctrine of impossibility of performance. The judgment also could be affirmed on the ground that the fee agreement at issue is invalid because it purports to charge an unreasonable attorney's fee.

I. **Relevant Facts**

9

¶22.    Blackburn's fee agreement purported to charge a fee of $265,000 for legal services "in connection with [Burford's] estate planning documents, consultations, updates/revisions, and the formal administration of [Burford's] estate upon his demise including assistance with [Burford's] revocable living trust."[3]

¶23.    Blackburn drafted Burford's five-page will that was admitted to probate in this case. The will is not unusual or complicated.  In response to discovery requests, Blackburn's former paralegal, Kimberly Archer, created a list of all documents that Blackburn allegedly drafted for Burford, as well as all subsequent revisions that were made to those documents. Archer listed a healthcare power of attorney, a power of attorney, a revocation of some unknown document, a certificate of trust, a revocable living trust, and a pour-over will. Blackburn did not produce any of these documents at trial or present any other evidence of their nature or purpose.  Notably, Archer testified that all of the documents were originally drafted in January 2007, but the fee agreement between Blackburn and Burford was not signed until June 4, 2008.  This obviously raises a question as to whether the original drafts were even covered by the fee agreement or were paid for separately.  The testimony at trial did not answer that question.

¶24.    Archer's list also shows that Blackburn revised some of Burford's documents in April and again in May 2007—still prior to the execution of the fee agreement that Blackburn is attempting to enforce in this case.  Finally, Archer's list shows revisions to four of the documents in May 2009.

_____

[3] I will refer to both Blackburn and his estate as "Blackburn" and to both Burford and his estate as "Burford."

¶25. Archer testified that she actually drafted these documents herself under Blackburn's direction. She testified that it did not take her longer than two hours to draft any of the documents and several took her only ten or twenty minutes.

¶26. Archer also created a list of all scheduled office meetings between Blackburn and Burford. She listed thirteen such meetings between 2007 and 2011. Six of the thirteen meetings occurred prior to the execution of the fee agreement at issue. Archer testified that none of the meetings lasted longer than two hours.

¶27. Archer's testimony at trial was vague and offered few specifics. She contradicted herself, and her answers seemed to change depending on who was asking the questions. On direct examination, in response to questions from Blackburn's lawyer, she testified, "We changed [Burford's] documents quite a bit. I would say maybe monthly, certainly." However, on cross-examination, Archer was asked to confirm that "there were no other revisions other than what" was shown on the list discussed above. Archer responded, "[T]hose are the only times that we revised it, is that list right there." Finally, on redirect examination, Archer reasserted that Burford "would want to change his documents every time he changes his clothes."

¶28. Archer testified that Burford would stop by the office "often" or "quite a bit" to see Blackburn and that their unscheduled meetings were not recorded or reflected on her list of meetings. She also testified that Blackburn and Burford met outside the office after hours and sometimes had dinner ("steak and whiskey") together. On cross-examination, Archer testified as follows regarding those out-of-office meetings:

Q.    ... [Y]ou're not telling the Court today that those were all business meetings, are you? I just want to make sure that's not what you're saying.

A.    I wouldn't know if they were or they weren't. I wasn't there.

Q.    .... [Y]ou don't know that they weren't all just personal meetings; is that correct?

A.    I can't say either way.

But then on redirect examination, Archer agreed, over a hearsay objection, that Blackburn had told her that "many of [the out-of-office] meetings were to discuss estate planning."

¶29. Archer also claimed that Blackburn "did a real estate closing [for Burford] and handled an insurance claim when" Burford was in a car wreck. However, she "couldn't find" any of those files. There was no testimony or evidence as to when the closing or car wreck occurred. Nor was there any testimony or evidence concerning Blackburn's time or what services he performed in connection with either. Archer claimed that Blackburn handled these two issues for Burford at no charge because of their fee agreement. However, she also acknowledged that the real estate closing and the car wreck were not covered by the actual terms of the fee agreement.

¶30. Archer asserted that Blackburn expected that Burford would have a "taxable estate." She implied that this meant that Burford's estate planning was more complicated than a typical estate. However, Blackburn did not introduce any evidence of the size of Burford's estate or what planning was done for it. The only meaningful evidence of assets in the record is that Burford owned real property in Tate County with a total appraised value of approximately $242,998.74. In a pleading, the estate represented to the chancery court that

12

the total value of the estate was approximately $463,000, consisting of the real property, "some cash and bonds, a small amount of farm equipment, a pickup truck and miscellaneous household and personal items." The chancery court adopted that figure in its findings of fact, albeit without any supporting documentation.

## II. Analysis

¶31. Rule 1.5 of the Mississippi Rules of Professional Conduct clearly mandates that "[a] lawyer's fee shall be reasonable." M.R.P.C. 1.5(a). Section 34 of the Restatement (Third) of the Law Governing Lawyers (2000) likewise states that "[a] lawyer may not charge a fee larger than is reasonable under the circumstances." This principle applies not only in disciplinary disputes but also in contract disputes between lawyers and clients. 1 Geoffrey C. Hazard et al., *The Law of Lawyering* § 9.06.1, at 9-18 (4th ed.) ("[I]n a variety of civil contests between lawyers and clients over fees, the client will prevail unless the lawyer's fee is reasonable."). Indeed, "courts are generally more likely to find a fee unreasonable in the sense that it is unenforceable against the client than they are to find the same fee so unreasonable as to warrant professional discipline." *Id.* at 9-23. "[I]n fee disputes between lawyer and client, [an unreasonable] fee will not be approved . . . *even though the parties had agreed to the fee*." Restatement, *supra*, § 34 cmt. a (emphasis added). In such cases, "[a] client-lawyer fee arrangement *will be set aside* when its provisions are unreasonable to the client." *Id.* cmt. b (emphasis added); *accord* 1 Robert L. Rossi, *Attorneys' Fees* § 1:18, at 1-56 (3d ed.) ("Courts may scrutinize fee agreements to determine the reasonableness of the fee, and have the inherent power to refuse to enforce contracts for excessive fees. Thus, the

13

excessiveness of the fee may be asserted by the client as a contract defense in an action to recover an attorney's fee.").[4]

¶32. "Such a rule obviously encroaches upon the freedom of contract, but the limitation of reasonableness is a longstanding one." 1 Hazard et al., *supra*, § 9.02, at 9-8. Moreover, the rule simply recognizes that "[l]awyers . . . owe their clients greater duties than are owed under the general law of contracts." Restatement, *supra*, § 34 cmt. b; *see also, e.g.*, *In re A.H. Robins Co.*, 86 F.3d 364, 374 (4th Cir. 1996) ("An attorney has the burden of proof as to the reasonableness of his fee when he sues to recover from his client. This allocation of the burden of proof is premised on the relationship of trust owed by a lawyer to his client, with concomitant obligation to charge only a reasonable fee . . . . This approach is at the very heart of the special relationship between attorney and client.") (quoting *McKenzie Construction Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985)). "Fee contracts between attorney and client are the subjects of special interest and concern to the courts, and are not to be enforced on the same basis as ordinary commercial contracts." 1 Rossi, *supra*, § 1:13, at 1-42.

¶33. There are few reported Mississippi cases about contractual fee disputes between attorneys and clients. However, as stated above, our law is clear that a lawyer may not charge or attempt to collect an unreasonable or excessive fee. *See* M.R.P.C. 1.5(a); *Miss.*

---

[4] "Although reasonableness is usually assessed as of the time the contract was entered into, later events might be relevant." Restatement, *supra*, § 34 cmt. c. For instance, a large flat fee may be found unreasonable if it far exceeds the reasonable value of the services ultimately provided by the attorney. 1 Hazard et al., *supra*, § 9.06.2, at 9-24 to -25; Jeffrey Jackson & Donald Campbell, *Professional Responsibility for Mississippi Lawyers* § 22:7, at 22-9 (2010).

14

*State Bar Ass'n v. A Miss. Atty.*, 489 So. 2d 1081 (Miss. 1986). Moreover, the Mississippi Supreme Court has held that a fee agreement "will be held invalid" if it provides for a fee that "is so excessive in proportion to the services to be rendered as to be in fact oppressive or extortionate." *Fitzpatrick v. Kellner*, 187 Miss. 843, 850-51, 193 So. 911, 912-13 (1940); *accord Ownby v. Prisock*, 243 Miss. 203, 207-08, 138 So. 2d 279, 280 (1962).

¶34. The fee agreement at issue in this case is invalid and unenforceable because it purports to charge an unreasonable and excessive fee. The record shows that Blackburn drafted and later revised a relatively simple will and a few other documents. The other documents are not even in the record, but apparently none took much time for Archer to create. As noted above, the original drafts of the will and other documents and two rounds of later revisions all predated the fee agreement that Blackburn is attempting to enforce in this case. Blackburn implies that Burford's estate was expected to be large or complicated, but there is no credible evidence in the record to show that. There was testimony suggesting that Burford was perhaps a difficult client who required some special attention; however, as discussed above, that testimony was also vague and internally contradictory. There was also vague testimony that Blackburn handled a "car wreck" and a "real estate closing" for Burford. But Blackburn presented absolutely no evidence as to what or how much time either matter involved. More important, neither matter related to the fee agreement that Blackburn seeks to enforce in this case, which covers only estate planning and administration.

¶35. In affirming the judgment of the chancery court, we also affirm the chancellor's

finding that "approximately 36 hours of work" was *actually proven* based on the testimony presented at trial in this case. That is a reasonable finding based on the "less-than-ideal evidence presented by the parties to the litigation." *Pruitt v. Pruitt*, 144 So. 3d 1249, 1252-53 (¶11) (Miss. Ct. App. 2014) (emphasizing that a chancellor's findings must be based on the evidence presented by the parties, even if that evidence is less than ideal). A fee of $265,000 for thirty-six hours of work is clearly unreasonable and excessive, and no other evidence was presented at trial that could possibly justify such a fee. Burford ultimately received a relatively simple will and a few other documents that, while not in the record, apparently were not complicated to create. For those services, $265,000 clearly is an unreasonable and excessive fee. This renders the fee agreement invalid and unenforceable. *Fitzpatrick*, 187 Miss. at 850-51, 193 So. at 912-13; *Ownby*, 243 Miss. at 207-08, 138 So. 2d at 280; Restatement, *supra*, § 34 cmt. a; Hazard et al., *supra*, § 9.06.1, at 9-18; Rossi, *supra*, § 1:18, at 1-56 (3d ed.). Therefore, the judgment of the chancery court could also be affirmed on this ground.[5]

**C. WILSON, J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**

---

[5] Although the chancery court decided this case on other grounds, the estate alleged that the fee was unreasonable in its objection to the probated claim, and the estate briefed the issue on appeal as an alternative ground for affirmance. The appellee is "entitled to raise any alternative ground based on the pleadings in the court below which would support the judgment here." *Brocato v. Miss. Publishers Corp.*, 503 So. 2d 241, 244 (Miss. 1987). No cross-appeal was required for the estate to raise this alternative ground for affirmance. *Empire Abrasive Equip. Corp. v. Morgan*, 87 So. 3d 455, 461 (¶21) (Miss. 2012).