**In re MERRY–GO–ROUND ENTER-PRISES, INC., MGR Distribution Corporation MGRR, Inc. and Alameda Chess King, Inc., et al., Debtors.**

**Bankruptcy No. 94–5–0161–SD to 94–5–0163–SD, 94–5–3774–SD.**

United States Bankruptcy Court,
D. Maryland,
at Baltimore.

Jan. 27, 2000.

Joel I. Sher, Shapiro & Olander, Baltimore, Maryland, for trustee.

Deborah Hunt Devan, Neuberger, Quinn, Gielen, Rubin & Gibber, Baltimore, MD, for Chapter 7 Trustee.

Paul M. Nussbaum, Ward B. Coe, Whiteford, Taylor & Preston, LLP, Baltimore, Maryland, Stephen L. Snyder, Snyder, Weiner, Weltchek, Vogelstein & Brown, Baltimore, Maryland, for Snyder, Weiner, Weltchek, Vogelstein & Brown.

Irving E. Walker, Joel L. Perrell, Jr., Miles & Stockbridge, Baltimore, Maryland, Bruce R. Zirinsky, Cadwalader, Wickersham & Taft, New York City, for Fidelity Management & Research Company.

David M. Friedman, Lorie R. Beers, Kasowitz, Benson, Torres & Friedman, New York City, for Bears, Stearns & Co., Inc.

Karen H. Moore, Assistant U.S. Trustee, Office of the U.S. Trustee, Baltimore, Maryland, for the U.S. Trustee.

*MEMORANDUM OPINION AWARDING FEE TO SNYDER, WEINER, WELTCHEK, VOGELSTEIN, & BROWN, AS SPECIAL LITIGATION COUNSEL TO THE CHAPTER 7 TRUSTEE*

E. STEPHEN DERBY, Bankruptcy Judge.

## I. *Issue Presented*

Is a deal a deal when the deal is an attorney's contingent fee agreement with a Chapter 7 bankruptcy trustee that hit a home run? The court concludes on the facts of this case that the answer is yes; and payment to special counsel based on a 40% contingent fee for an extraordinary recovery by the bankruptcy estate will be approved.

The law firm of Snyder, Weiner, Weltchek, Vogelstein & Brown ("Snyder, Weiner") represented the Chapter 7 Trustee, as special counsel, in a lawsuit brought by the Trustee against the accounting firm of Ernst & Young. The lawsuit settled on the eve of trial for $185,000,000, and the settlement has been collected by the Trustee. Snyder, Weiner seeks court approval of a contingent fee in the amount of $71,200,000. This figure represents its 40% contingent fee agreement with the Trustee, reduced by $2,000,000 to reflect a settlement with an objecting, major creditor.

## II. *Findings of Fact*

### A. *Bankruptcy Case History*

Merry Go Round Enterprises, Inc. and affiliates ("MGRE") operated several chains of specialty clothing stores that sold fashion clothing to young men and women. It filed a Chapter 11 bankruptcy petition on January 11, 1994. At the commencement of its reorganization case, MGRE operated roughly 1,450 stores in 44 states and the District of Columbia, and it employed about 20,000 people. The approximate book values of MGRE's assets was $465 million and its liabilities was $265 million. Cash on hand was variously represented as $90 to $100 million.

Shortly after filing its Chapter 11 petition, MGRE applied for approval to employ Ernst & Young as its turnaround specialist. In its application MGRE represented that it had chosen Ernst & Young because of its success in numerous other cases. MGRE stated that Ernst & Young would prepare financial information for MGRE, assist in developing a plan of reorganization, assist in negotiating approval of a plan, render expert testimony as to the feasibility of a proposed plan, and assist with other matters as requested by MGRE. The court approved Ernst & Young's employment on February 1, 1994.

After operating more than two years as a Chapter 11 Debtor in Possession, MGRE moved on February 13, 1996 for permission to close its 435 remaining stores and to liquidate the remainder of its inventory. MGRE had no cash reserves at the time of the motion. The United States Trustee promptly countered with an emergency motion to convert the case to Chapter 7. On March 1, 1996, after a contested hearing, the court granted the U.S. Trustee's motion and converted the case to Chapter 7.

### B. *Employment of Special Counsel by the Chapter 7 Trustee*

On October 14, 1997, Deborah H. Devan, the Chapter 7 Trustee for the MGRE bankruptcy estates, filed her Application for Authority to Employ Special Litigation Counsel (the "Employment Application"). Dkt.P. 5716. She served a Notice to Creditors with the Employment Application attached on all committees, all principal constituencies of the MGRE bankruptcy estate, the U.S. Trustee and all those parties in interest who requested notice under Fed.R.Bankr.P.2002(i). See *id.*

The Trustee represented from her review of MGRE's financial affairs and the events leading to conversion of the cases that the estate might have valid causes of action against parties who rendered services to MGRE prior to conversion, including professionals, officers and/or directors. Although the Trustee disclosed she did not know if there actually was a viable cause of action, she stated that "damages may be in the hundreds of millions of dollars or a billion dollars." Dkt.P. 5716, Empl.Appl. at ¶ 20. She sought to employ special litigation counsel to complete her investigation of whether there were viable causes of action, to identify potential defendants and, "if justified, to commence litigation." *Id.* at ¶ 4.

The Trustee's goal was to retain a law firm with a team of experienced and able litigators that would aggressively represent the MGRE bankruptcy estate. She concluded that a contingency fee arrangement was the best option for the estate based on the inherent risks of this type of litigation and because of the estate's lack of resources and potential administrative insolvency. A contingent fee arrangement, in the Trustee's opinion, would also provide an incentive to special counsel to obtain the best result possible. Further, reasoning that the only way in which the estate could responsibly afford to bring this action and she could fulfill her fiduciary duty to unpaid administrative claimants, the Trustee sought to engage counsel who was willing to bear both the litigation risks and costs. The costs of litigation were estimated by the Trustee as likely to exceed one million dollars, if litigation was instituted.

The Trustee searched in the Virginia, Washington, D.C. and Maryland region for a firm that was experienced in matters of complex commercial litigation, that would bear much of the costs of litigation, including legal fees and expenses, and that would agree to a contingent fee arrangement. Although other firms expressed interest in some contingency fee arrange-

ment, only Snyder, Weiner was willing to accept a pure contingency fee and risk the estimated, substantial out of pocket costs on a successful outcome. Other firms proposed hourly fee or modified hourly/contingent fee arrangements, and none was willing to advance at least $250,000 in costs payable only from a recovery. Dkt.P. 5716, Empl.Appl. at ¶ 11.

Because this case had been converted from Chapter 11 to Chapter 7 on March 1, 1996, the Trustee was concerned that there be no delay in completing the investigation she had commenced and in initiating any viable lawsuit. Consequently, she sought assurances from prospective counsel that representation of the estate would be given priority and pursued aggressively. In her Employment Application, the Trustee represented that Snyder, Weiner had made such a commitment. Snyder, Weiner had " . . . agreed that if there [were] lawsuits to be commenced, . . . [it would] make every effort to file them by the end of 1997." *Id.* at ¶ 19. The Trustee represented that Snyder, Weiner had agreed to a requirement to "drop everything" to commence the representation, and this commitment factored into negotiation of the contingency fee. *Id.*

Snyder, Weiner was a firm of only ten lawyers, but its principals were highly experienced and skilled in complex commercial matters and high stakes plaintiff's litigation. In the opinion of the Trustee, who is herself an able and experienced commercial and bankruptcy practitioner, Snyder, Weiner was the best firm offering the best terms to the estate.

The Trustee proposed to retain Snyder, Weiner on a 40% contingency fee basis, with costs to be shared between Snyder, Weiner and the Chapter 7 estate. Snyder, Weiner agreed to advance the first and third $250,000 of litigation expenses, as well as all expenses above one million dollars. The agreement provided that repayment of advanced expenses was contingent on recovery. This latter point was most important to the Trustee because she was

concerned that significant estate assets should not be wasted on high risk litigation. The Trustee attempted to negotiate a lower contingency fee or one on a sliding scale, but she was not successful.

In addition to the considerations described previously, the Trustee advanced several other reasons in support of a 40% contingent fee. The litigation, if commenced, would be complex and unprecedented. There would likely be novel and substantial legal obstacles to overcome. Readily apparent to the court under almost any scenario, for example, were defenses that MGRE was contributory negligent, that any particular action could not be shown to be the proximate cause of financial injury when MGRE had filed for reorganization because it had financial difficulties, and that significant damages to a debtor in bankruptcy could not be proved, even if liability was established. Any defendant could be expected to defend vigorously and to have the financial resources to do so. For success, special counsel would have to anticipate a multitude of motions, lengthy and hard fought discovery, difficulties in presenting complicated financial problems in an understandable fashion at trial, and interminable, plausible appeals. It could take years, or even a decade or more, to reach a final resolution, and special counsel would stand to lose everything it had invested at any point.

Snyder, Weiner would additionally lose other professional opportunities because of the need to dedicate its available resources to the MGRE effort. The Trustee insisted that any litigation be pursued aggressively to obtain as prompt a resolution as possible because she was conscious of her obligation as a Chapter 7 Trustee to liquidate and distribute the estate expeditiously. See 11 U.S.C. § 704(1); In re Hutchinson, 5 F.3d 750, 752–54 (4th Cir.1993). Snyder, Weiner would also have to carry hundreds of thousands of dollars in expenditures for costs at risk, because they could only be recouped from an affirmative recovery by the bankruptcy estate. These costs would include not only litigation expenses, but also the firm's overhead and salaries of employees.

The Trustee conferred with the major creditor constituencies, as well as the U.S. Trustee, and no one expressed disagreement with the proposed representation. It appeared at this juncture that the odds of any meaningful recovery were slim to none. One party, however, Berlack, Israels & Liberman LLP ("Berlack"), objected to the Trustee's application. Berlack's main concern was that the court would subsequently not be able to review Snyder, Weiner's fees under a reasonableness standard. Rather, Berlack argued, the court would be restricted to the standards of 11 U.S.C. § 328(a). Berlack suggested that the court allow the employment of Snyder, Weiner on terms similar to those approved in In re Olympic Marine Services, Inc., 186 B.R. 651 (Bankr.E.D.Va.1995), where the court approved a fee agreement subject to further review of the court for reasonableness at the conclusion of the firm's representation.

This court found that the Trustee's reasoning was sound and based on adequate investigation and that the 40% contingent fee agreement was reasonable under the circumstances. Consequently, on November 10, 1997, the court approved Trustee's motion to employ Snyder, Weiner over the objection of Berlack. Dkt.P. 6005. In that order the court stated that "the court may allow payment of compensation and reimbursement of expenses to [Snyder, Weiner] pursuant to the Agreement and subject to the provisions of § 328 of the Bankruptcy Code...." Id. at 2.

The Trustee and Snyder, Weiner subsequently requested that the court clarify its order. However, the motion was withdrawn after the court made the following statements on the record:

I signed the stipulated order knowing that I was approving a 40 percent contingent fee agreement, *knowing that I was not adopting the approach of Judge Tice in the Olympic Marine* case be-

cause I saw in this case based on the application and the representations of the Trustee that the law firm was advancing substantial capital and making a substantial commitment to this effort. [P. 6196 at 22–23 (emphasis added)]

****

And I thought that a 40 percent contingent fee under those circumstances was reasonable. And that was the impact of my order and that's what I thought I had done. And when I saw in the order that it was *subject to review under Section 328(a)*, I think that was extremely appropriate. *I think that's the right standard of review for this arrangement.* [*Id.* at 23 (emphasis added)]

****

I think the state of the law is and I think the majority of the cases are, and I think it has also been reflected in this district by published opinions in this district, is that *once you approve a contingent fee agreement as reasonable at the outset, the standard of review when the applications are filed is the § 328(a) standard.* [*Id.* at 25 (emphasis added)]
The court also discussed and endorsed *In re R.E. Tull & Sons, Inc.*, 28 B.R. 112 (Bankr.D.Md.1983) (Mannes and Schneider JJ.), in which the court held that standard of review under section 328(a) is whether the conditions of the original hiring were improvident. See P. 6196 at 26; 28 B.R. at 114. No other party in interest requested reconsideration of Snyder, Weiner's employment order; no one appealed; and the retention order became final.

In August, 1998, Trustee requested that the court allow an amendment to the fee agreement. As discussed above, the original fee agreement provided that Snyder, Weiner would advance the first and third $250,000 of the litigation expenses as well as all expenses incurred above one million dollars. Under the proposed amendment Snyder, Weiner agreed to advance all litigation expenses. On October 9, 1998, the court approved this amendment to the fee agreement. Dkt. P. 6687.

## C. *The Ernst & Young Litigation*

On December 1, 1997, Snyder, Weiner, on behalf of Trustee, filed a three count complaint against Ernst & Young (the "Ernst & Young Litigation") in the Circuit Court for Baltimore City. The complaint alleged fraud, fraudulent concealment, and negligence/malpractice. This action was unusual because it required the plaintiff Trustee to establish a standard of care for restructuring accountants and business advisors in a bankruptcy case. After Ernst & Young removed the action to this court, on the Trustee's motion it was remanded to the Circuit Court for Baltimore City. The remand was appealed by Ernst & Young and affirmed by the United States District Court for the District of Maryland. *In re Merry–Go–Round Enterprises, Inc. (Ernst & Young, LLP v. Devan)*, 222 B.R. 254 (D.Md.1998).

Trial was scheduled to begin in April, 1999. On the eve of trial, after Ernst & Young's writ of mandamus to postpone the trial was denied by the Maryland Court of Special Appeals, the parties agreed to a settlement of $185 million. The court approved the settlement on June 3, 1999. Dkt.P. 7053. The full $185,000,000 has been collected by the Trustee pursuant to the terms of the settlement. This amount was collected just two years after Snyder, Weiner commenced its representation of the Trustee.

## D. *Objection to Snyder, Weiner's Contingency Fee.*

Bear, Stearns & Co., Inc. ("Bear, Stearns") was the only party, after notice, that originally objected to the application of Snyder, Weiner for approval of its contingency fee in the amount of $73.2 million, based on 40% of the bankruptcy estate's net recovery after reimbursement of $2 million in expenses. Bear, Stearns withdrew its objection after Snyder, Weiner agreed to reduce its fee request by $2 million to $71.2 million, which is 38.9% of

the net recovery. After expiration of the objection period, however, Fidelity Management & Research Company ("Fidelity") filed a memorandum joining in the objection of Bear, Stearns, which was in the process of settling its objection. Fidelity, including its managed funds and affiliates, is one of the largest unsecured creditors of MGRE, and the court has considered its objections.

Fidelity argues that Sections 328(a), 330 and 105(a) of the Bankruptcy Code (11 U.S.C.) provide the court with the authority and the obligation to evaluate a previously approved fee application to determine its reasonableness. Fidelity urges that the payment of such a large fee to Snyder Weiner would constitute an unacceptable and unprincipled windfall that could not have been anticipated by the court at the time that it approved the fee agreement. Applying lodestar analysis, Fidelity argues that Snyder, Weiner is not entitled to the fees that equal by its calculation, before the $2 million reduction, 21 times the amount of fees based on hours expended at customary hourly rates. Fidelity's position is that creditors, not the special litigation counsel, should be the principal beneficiaries of the Ernst & Young settlement. Fidelity analogizes the present case to "common fund" and mega cases, and it contends that Snyder, Weiner is entitled to be paid not more than 10% of the settlement fund as within the range of fees awarded in such large cases.

### E. *Conclusions of Fact.*

From the testimony of the Trustee, of Arnold M. Weiner, Esq., and Stephen L. Snyder, Esq., and of various experts at the hearing on Snyder, Weiner's fee application, the legal obstacles to a successful resolution that Snyder, Weiner faced were as great or greater than the Trustee had anticipated. When the Ernst & Young Litigation was filed, respected legal authorities were reported as opining that it would be extremely difficult, if not impossible, to establish a requisite standard of care for a restructuring accountant acting in a consulting capacity. The action was viewed as unprecedented and likely to be unsuccessful. Ernst & Young was represented by two law firms of national stature who vigorously defended their client. There was a reluctance by potential witnesses to cooperate with the plaintiff because of the perceived influence of the defendant in the business community, and expenses incurred by Snyder, Weiner significantly exceeded the Trustee's initial estimates, in part due to the need for extensive expert analysis and testimony. Although Snyder, Weiner had undertaken a preliminary inquiry before agreeing to represent the Trustee, it did not finalize its initial inquiry and did not recommend that the Trustee initiate litigation against Ernst & Young until after its retention had been approved by the court.

Based on this record and on all accounts to the court, without a murmur of dissent, Snyder, Weiner provided outstanding legal services as special counsel to the Chapter 7 Trustee. The Ernst & Young Litigation was imaginatively conceived, skillfully staged, thoroughly prepared, aggressively pursued, and timely and successfully resolved for the great benefit of MGRE's bankruptcy estate.

Snyder, Weiner undertook representation of the Chapter 7 Trustee as special litigation counsel facing long odds for a positive result. Further, it undertook the representation on a purely contingent fee basis. Snyder, Weiner's willingness to undertake this litigation on a pure contingency basis for both fees and expenses was pivotal to the Trustee's decision to move forward. Although in the original retention agreement the bankruptcy estate would pay the second and fourth $250,000 of expenses, the retention agreement was subsequently modified to provide that Snyder, Weiner would pay all expenses. From the outset, the Trustee and Snyder, Weiner anticipated that expenses would exceed $1,000,000. Snyder, Weiner actually incurred expenses of $2,000,000 before the Ernst & Young Litigation was settled

on the eve of trial, and the court has previously approved payment of this amount to Snyder, Weiner from the settlement proceeds.

As a result of Snyder, Weiner's litigation efforts, the Trustee, who was previously faced with administratively insolvent estates for Chapter 11 expenses, is now in a position to administer a considerable sum of money for the benefit of creditors. If Snyder, Weiner had not been willing to complete the Trustee's investigation and to undertake the Ernst & Young Litigation, it is extremely unlikely that the litigation would have been pursued. MGRE's bankruptcy estate would thus have been deprived of this extraordinary net benefit exceeding $110,000,000.

To the extent that additional information was developed in connection with consideration of the fee application that would have been material to the court's initial approval of Snyder, Weiner's retention, it confirms the court's authorization of Snyder, Weiner's employment as special counsel pursuant to its contingency fee agreement and subject to the provisions of 11 U.S.C. § 328(a). Viewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range.

The Chapter 7 Trustee supports Snyder, Weiner's fee application, as does the U.S. Trustee. Except for Fidelity's tardy objection, no other creditor or party in interest of the MGRE estate objects to the fee application, as modified, after comprehensively circulated notice.

### III. *Conclusions of Law*

**A.** *Section 328(a) sets forth the applicable standard.*

It would be an understatement to say that Snyder, Weiner's application for approval of a fee of $71,200,000 in a Chapter 7 bankruptcy case gives the court pause. The requested fee is what is due to the firm under a contingency fee agreement approved in advance by the court under 11 U.S.C. § 328(a) as constituting reasonable terms and conditions of employment. When viewed after the fact under the 12 factor lodestar analysis customarily used in determining reasonable attorneys' fees, the amount of the fee requested would appear at first blush to be a windfall to special counsel. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), endorsed in this circuit in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.1978).

A reason for this appearance of windfall is that a lodestar analysis usually starts with the time spent by counsel times counsel's customary hourly rate. Although Snyder, Weiner has not provided hourly rates for its attorneys because it customarily represents clients on a contingency basis, it has provided time logs showing 12,087 attorney hours. Based on Fidelity's analysis which assumes a $300 blended hourly rate would be reasonable, the contingent fee requested by Snyder, Weiner, as modified, of $71.2 million would be 19.6 times the lodestar starting point. See Fidelity Mem., p. 13 n. 5. The court, however, concludes that it is inappropriate to use a lodestar analysis post-recovery to determine a reasonable fee for Snyder, Weiner.

A Chapter 7 trustee, with the court's approval, may employ counsel to represent her. 11 U.S.C. § 327(a). Compensation of counsel, as a professional person, is also controlled by the Bankruptcy Code. Section 330(a), as applicable in this case,[1] provided, in relevant part:

(a) After notice to any parties in interest and to the United States trustee and

---

**1.** The former version of section 330(a) is applicable to this case because the case was filed on January 11, 1994, before the effective date of the 1994 amendments, which was October 22, 1994. Bankruptcy Reform Act of 1994, Pub.L. 103–394, § 107, 108 Stat. 4111; Pub.L. No. 103–394, § 224(b), 108 Stat. 4119, 4130. Present section 330(a) is not different in respects material to this opinion.

a hearing, *and subject to sections ... 328 ... of this title,* the court may award ... to a professional person employed under section 327 ... of this title, ...

(1) reasonable compensation for actual, necessary services rendered by such ... professional person, or attorney, as the case may be, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; ....

11 U.S.C. § 330(a) (1994) (Emphasis supplied.).

■ Section 328(a), however, allows for approval of a contingency fee agreement in advance of the rendering of legal services. It provides:

(a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, *on any reasonable terms and conditions of employment, including* on a retainer, on an hourly basis, or *on a contingent fee basis.* Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a). (Emphasis supplied.).

The issue before the court under section 328(a) at the time of the court's approval of the retention agreement in 1997 was whether the agreement was reasonable. In this case, after notice, the court approved Snyder, Weiner's 40% contingency fee agreement with the Trustee as reasonable at the time of Snyder, Weiner's retention, and the order became final, without appeal.

Although the U.S. Court of Appeals for the Fourth Circuit has not directly considered in a published opinion how section 328(a) should be applied to a fee award under a fee agreement that was preapproved by a bankruptcy court, the two circuit courts that have done so have concluded section 328(a) controls, rather than section 330(a). In *In re Reimers,* 972 F.2d 1127 (9th Cir.1992) the court reversed and remanded the district court's affirmance of the bankruptcy court's approval of a fee less than provided in counsel's preapproved 40% contingency fee agreement. The bankruptcy court had reduced the fee after conducting a general reasonableness review of hours and rates. The circuit court held:

Under section 328, *where the bankruptcy court has previously approved the terms for compensation of a professional,* when the professional ultimately applies for payment, the court cannot alter those terms unless it finds the original terms 'to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.'

*Id.* at 1128. (Emphasis supplied.).

The error made by the lower courts in *Reimers,* and the reason for the remand, was that in reducing counsel's fee the bankruptcy court had not made a specific finding of "... unanticipated developments that rendered the original terms improvident." *Id.* Consequently, the court directed:

On remand, the bankruptcy court should award compensation to Giles in accord with the contingent fee agreement, unless the court, based on findings supported in the record, concludes that the agreement was 'improvident' in light or unforeseeable developments.

*Id.* at 1129. See 11 U.S.C. § 328(a).

The bankruptcy court in *In the Matter of National Gypsum Company,* 123 F.3d 861 (5th Cir.1997) also had reduced a pro-

fessional's compensation from that provided in its retention agreement that had been preapproved under section 328(a). Although in its retention order the bankruptcy court had expressly retained " 'the right to consider and approve the reasonableness and amount . . .' " of the fees on a final basis, the circuit court reversed and remanded. *Id.* at 862. The court stated: "If prior approval is given to a certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved." *Id.* By expressly retaining the right to review reasonableness the bankruptcy court was found to have only recited its control of compensation in the event of unanticipated circumstances. *Id.* at 863.

An important policy consideration for honoring fee agreements with professionals that was described in *National Gypsum* is the need to attract the most competent professionals to assist in complicated commercial bankruptcy cases. The court stressed:

> If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment. Courts must protect those agreements and expectations, once found to be acceptable.

*Id.* This policy consideration was reiterated in the affidavit of David W. Allard, Esq., president elect of the National Association of Bankruptcy Trustees, that was submitted in support of Snyder, Weiner's fee application.

█ This court adopts the rationale and public policy considerations advanced in *Reimers* and *National Gypsum.* For these reasons section 328(a) controls the court's review and action on Snyder, Weiner's fee application. Because Snyder, Weiner's fee agreement was expressly approved at the outset under section 328(a) as reasonable, the only issue for resolution

now is whether the terms of the agreement were ". . . improvident in light of developments not capable of being anticipated . . ." when the court approved the agreement. 11 U.S.C. § 328(a).

**B. There were no developments not capable of being anticipated that make Snyder, Weiner's contingent fee agreement improvident.**

*(i)*

[5] A settlement prior to trial is capable of being anticipated. See, *e.g., In re Olympia Holding,* 176 B.R. 962 (Bankr. M.D.Fla.1994); *In re Confections by Sandra, Inc.,* 83 B.R. 729 (9th Cir. BAP 1987); *In re Benassi,* 72 B.R. 44 (D.Minn.1987). The Contingency Fee Representation Agreement that the court approved between the Trustee and Snyder, Weiner specifically provided that Snyder, Weiner would be entitled to a fee of 40% of the net recovery "whether by settlement or verdict." Dkt. P. 5716, Exh. B at 1. This provision was recited in the Trustee's Employment Application. *Id.* at ¶ 9.

█ The size of the settlement that Snyder, Weiner achieved was also capable of being anticipated. In her application to employ special counsel the Trustee represented that although the amount of any demand had not yet been calculated, ". . . damages may be in the hundreds of millions of dollars or a billion dollars." *Id.* at ¶ 20.

Merely because a pretrial settlement and a recovery in the range of $185 million appeared highly unlikely when the contingency fee was approved by the court does not mean they were not capable of being anticipated. It would be ironic to deprive counsel of the benefits of its contingency fee agreement because counsel was successful in obtaining a highly successful result against great odds. More important, however, revisiting a preapproved contingency agreement in circumstances such as are present here would discourage others among the most competent attorneys from

undertaking similar high risk, complex, commercial litigation in bankruptcy cases that a trustee may conclude is justified. Such a precedent would be contrary to public policy.

■ The legal and factual issues in the Ernst & Young Litigation were, if anything, more extensive, difficult and complex than anticipated by the Trustee and the court. As anticipated, the defense was vigorous, able and well financed. Snyder, Weiner was successful in certain disputes over legal issues that appear to have been pivotal in how the Ernst & Young Litigation would be presented procedurally and may have induced a willingness to settle. However, success was capable of being anticipated. Special counsel had an ethical obligation not to file an action unless it was warranted by existing law or a nonfrivolous extension thereof, with evidentiary support and not for an improper purpose. Cf., Fed.R.Bankr.P. 9011(b); Fed.R.Civ.P. 11(b)(1), (b)(2), (b)(3); and MD Prof. Cond. R. 3.1 (2000).

### (ii)

The disparity by a multiple of almost 20 between a pure hourly based fee for the Ernst & Young Litigation and the contingent fee requested by Snyder, Weiner itself raises the specter of whether the requested fee would violate the rules of professional conduct for lawyers. Has Snyder, Weiner's contingent fee agreement, which was approved in advance by the court as reasonable for the bankruptcy estate, produced a result that would be unethical for Snyder, Weiner to enforce because of a unique combination of subsequent events? If it would be a violation of the rules of professional conduct for Snyder, Weiner to charge a fee for the Ernst & Young Litigation that was calculated in accordance with its contingency fee agreement, this court would find that the fee agreement has proved "... to have been improvident in light of developments not capable of being anticipated at the time ..." the agreement was

approved. 11 U.S.C. § 328(a). Alternatively, such a violation of the rules of professional conduct would prompt the court to exercise its "... inherent power and ... obligation to limit attorneys' fees to a reasonable amount." *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.)*, 86 F.3d 364, 373 (4th Cir.1996).

■ Because this court is a unit of the United States District Court for the District of Maryland, Maryland's Rules of Professional Conduct apply to lawyers practicing before it. Loc. Distr. R. (Md.) 704 (1997). See 28 U.S.C. § 151. Maryland's Rules of Professional Conduct are adopted by the Court of Appeals in the exercise of its constitutional authority to regulate the practice of law. See *Post v. Bregman*, 349 Md. 142, 163, 707 A.2d 806, 815 (1998). As such, they constitute "... an expression of public policy having the force of law." *Id.* Under certain circumstances it appears that a violation of the Rules of Professional Conduct may be raised as a defense to enforcement of a lawyer's contract regarding fees. *Id.* at 168–170, 707 A.2d at 818–819; *Goldman, Skeen & Wadler, P.A. v. Cooper Beckman & Tuerk, L.L.P.*, 122 Md.App. 29, 40–44, 712 A.2d 1, 6–8 (1998).

■ Maryland Rules of Professional Conduct require that a lawyer's fee be reasonable. Rule 1.5 is the Rule of Professional Conduct that is most applicable here.

Rule 1.5 Fees.

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

\*\*\*\*\*\*\*

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) [which is not applicable here] or other law. . . .

Md. R. Prof. Cond. 1.5 (2000). Also of relevance is Rule 1.8(j)(2):

(j) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

\*\*\*\*\*\*\*

(2) subject to Rule 1.5 contract with a client for a reasonable contingent fee in a civil case.

*Id.* at Rule 8.1(j)(2).

 Under Maryland law, ". . . the question of the reasonableness of a contingent fee agreement, . . . must be revisited after the fee is quantified or quantifiable and tested by the factors enumerated in Rule 1.5(a)." *Attorney Grievance Commission v. Pennington,* 355 Md. 61, 74, 733 A.2d 1029, 1036 (1999). If a lawyer's fee that appeared reasonable at the outset becomes excessive, the attorney should reduce the fee. See *Attorney Grievance Commission v. Korotki,* 318 Md. 646, 664-65, 569 A.2d 1224, 1233 (1990). The determination of reasonableness for the court, therefore, is guided by the express eight factor test in Rule 1.5(a). Of the eight factors, seven weigh decidedly in favor of finding that the Snyder, Weiner contingency fee agreement is reasonable, and one arguably is balanced.

 Taking the factors from Rule 1.5(a) in reverse order, factors (8) through (5) support the reasonableness of Snyder, Weiner's contingent fee. Snyder, Weiner's fee agreement was totally contingent, not fixed [factor (8)]. Rules 1.5(c) and 1.8(j)(2) recognize a contingent fee agreement as an ethically permissible form of fee agreement. Reviewed as a contingency agreement, rather than a fixed hourly fee agreement, a fee of 40% of the net recovery is within a range of reasonableness, particularly for complex, professional malpractice litigation. Testimony of Alvin I. Frederick, Esq. See *Fraidin v. Weitzman,* 93 Md.App. 168, 190, 611 A.2d 1046, 1057 (1992).

The experience, reputation and ability of the attorneys was high [factor (7)]. The nature and length of Snyder, Weiner's professional relationship with the Trustee was limited, because the subject representation was the first and only one [factor (6)]. The Trustee and the circumstances both imposed demanding time constraints on the representation by requiring prompt and aggressive investigation, evaluation of possible claims, filing of any warranted action, and prosecution of the action filed, i.e. the Ernst & Young Litigation [factor (5)].

As to factor (4), the results obtained were spectacular, and the amount involved was unknown and uncertain at the outset. The range was a high probability of nothing to an unlikely possibility of ". . . hundreds of millions of dollars or a billion dollars." Dkt. P. 5716, Empl. Appl. at ¶ 20. The high risks involved in this representation support the reasonableness of the contingent fee.

Snyder, Weiner's pure contingency fee of 40% was also within the range of fees customarily charged in Maryland for similar services, thus satisfying factor (3). This conclusion is supported by the expert

testimony at the fee application hearing of Alvin I. Frederick, Esq. and Professor Jeffrey C. Hazard, Jr. Mr. Frederick is a respected and experienced Maryland attorney who concentrates his practice in the defense of professional malpractice allegations, including those against accountants and lawyers. He has been active in the Maryland State Bar Association, including as Chairman of the Litigation Section, Chairman of Ethics 2000, and in arguing proposed revisions of the disciplinary rules before the Court of Appeals. In his expert opinion the usual and customary fee charged by competent attorneys for handling a professional malpractice matter on a contingent fee basis is 33 1/3% to 40%, and recently most have been at the 40% contingency rate. Professor Hazard, presently at the University of Pennsylvania, who was the Reporter of the American Bar Association Rules of Professional Conduct and was Consultant for the American Bar Association Code of Professional Responsibility, further opined that a 40% contingent fee was within the reasonable range for high stakes commercial litigation nationwide, because he considered the relevant locality to be national. Both Mr. Frederick and Professor Hazard concluded Snyder, Weiner's contingent fee was reasonable under Rule 1.5(a) after considering all its criteria.

A related, additional, and important consideration is that Snyder, Weiner's contingency fee agreement was negotiated by sophisticated, experienced parties on both sides and was approved in advance by the court. This was not a contingency fee agreement where the attorney possessed undue leverage because of superior knowledge and sophistication.

Because Snyder, Weiner was a relatively small firm, the Ernst & Young Litigation was complex, and the Trustee insisted on aggressive efforts for a prompt resolution, the likelihood and reality of this representation was that Snyder, Weiner was precluded from other employment. The Trustee was aware that by accepting the subject representation Snyder, Weiner would lose other professional opportunities. Dkt. P. 5716, Empl. Appl. at ¶s 15, 19. Consequently, factor (2) supports the reasonableness of this contingent fee.

The final factor, number (1), includes several considerations. The novelty and difficulty of the questions involved were great, as was the skill required to perform the legal service properly. These considerations support the reasonableness of Snyder, Weiner's fee. Only the time and labor required suggest that the contingent fee is not reasonable. The fee is as much as 20 times a customary hourly rate fee. This one consideration alone, particularly when one stated factor that supports reasonableness is that the fee agreement was for a contingency, is insufficient to support a finding that Snyder, Weiner's contingency fee request is unreasonable.

In *Attorney Grievance Commission v. Korotki, supra,* an attorney was disciplined for charging a contingent fee that eventually reached 75%, after the attorney obtained unjustified increases for appeals. In reaching this result, the Maryland Court of Appeals observed:

> In seeking the increase, Korotki also crossed the fifty percent line and acquired a greater interest in the outcome of the litigation than his clients. Without passing upon whether there can ever be circumstances justifying a contingent fee in excess of fifty percent, it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake.

*Id.* at 665, 569 A.2d at 1233. The contingency fee of Snyder, Weiner neither crossed the 50% threshold nor gave Snyder, Weiner a greater interest in the outcome than the Trustee. In fact, the Trustee considered it desirable to give Snyder, Weiner the incentive of a contingent fee for this risky litigation when her resources were limited.

■ Maryland courts have not adopted a *per se* rule about what is an excessive

legal fee. In *Fraidin v. Weitzman*, the Court of Special Appeals refused to find a 50% contingent fee excessive. It reasoned: "Although a 50 percent contingency is high, the fee agreement was not excessive, or invalid, based on the facts of this case." 93 Md.App. at 190, 611 A.2d at 1057. The court then considered the eight factors that now comprise Rule 1.5(a), and it found the fee was not excessive. *Id.* at 191, 611 A.2d at 1058.

For these reasons, the fee requested by Snyder, Weiner both complies with 11 U.S.C. § 328(a) and is reasonable under Rule 1.5(a) of the Maryland Rules of Professional Conduct.

### C. *The court will not exercise its inherent power to limit the contingent fee of Snyder, Weiner.*

In *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.), supra,* which is binding on this court, the Court of Appeals for the Fourth Circuit stated that " ... the law of this [fourth] circuit has long been clear that federal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount." 86 F.3d at 373. *Accord In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833 (3d Cir.1994).[2] The court in *Bergstrom* further suggested that in a bankruptcy case the inherent authority of the court to review fees may also be found in 11 U.S.C. § 105. 86 F.3d at 374. The reduction of contingent fees as to surplus distributions for which plaintiffs' attorneys performed nominal services was affirmed, and the circuit court characterized the attorneys' claims as " ... wonder-

ful examples of chutzpah." *Bergstrom,* 86 F.3d at 377.

The authority of *Bergstrom* does not compel the reduction of Snyder, Weiner's contingent fee because of two material distinctions. First, the contingent fee agreements in *Bergstrom* were privately negotiated, and the court was reviewing their effect after the recoveries had been identified. By contrast, Snyder, Weiner's contingency fee agreement was approved by the court in advance as reasonable. Second, in *Bergstrom* the court found that counsel had made no showing that counsel's services had contributed to obtaining the supplemental distributions. *Id.* at 376. Snyder, Weiner's services, however, were integral to the Trustee's entire recovery. These distinctions mitigate against reduction of Snyder, Weiner's contingent fee.

Fidelity argues that Sections 328 and 330, read together, require the court to make an affirmative determination under the Bankruptcy Code that the fees requested by Snyder, Weiner are reasonable, i.e. to conduct a post-recovery reasonableness analysis. Such an analysis would be a lodestar analysis under 11 U.S.C. § 330(a). The court disagrees. Snyder, Weiner's fee request is based on a court approved contingency fee agreement. In *Bergstrom* the circuit court questioned whether a lodestar analysis is applicable to determine the reasonableness of a contingent fee. It stated:

> ... there is a serious question as to whether *Barber* applies to this inquiry into the reasonableness of a contingent fee. *Barber* is a fee shifting case, and in

---

2. In *Busy Beaver,* the Third Circuit quoted with favor the following eloquent articulation of the important interests at stake in reviewing a fee application:

> '[T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications sua sponte. The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law.... Nothing better serves to allay

> [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States Trustee] or other interested parties.'

*Id.* at 841 [quoting *In re Evans,* 153 B.R. 960, 968 (Bankr.E.D.Pa.1993) ].

it we were concerned that the district courts consider the twelve factors before assessing an attorney's fee against a party, who had not employed said attorney and had lost the litigation because of said attorney's efforts. There we sought to protect a party from an unreasonable fee sought by an opposing counsel.

86 F.3d at 376. As in *Bergstrom,* the subject fee application does not involve a fee shifting case. Further, to rule on the application does not require the court to set a reasonable fee in the first instance. Rather, the court is reviewing a fee determined by a contingent fee agreement, the terms of which were specifically approved in advance as reasonable. In the context presented by the instant application, the court concludes the lodestar analysis articulated in *Barber, supra,* is inapplicable.

Fidelity further argues that the appropriate fee for Snyder, Weiner should be based on principles applied to determine attorneys' fees in mega, common fund recovery cases. These cases, contends Fidelity, offer the closest analogy to this bankruptcy case because the Ernst & Young Litigation was brought, and the $185 million recovery was obtained, for the benefit of MGRE's creditors. *Cf. In re Churchfield Management & Investment Corp.,* 98 B.R. 838, 853 (Bankr.N.D.Ill. 1989). Under the common fund analysis for mega cases, Fidelity contends Snyder, Weiner's fee award should be limited to 10% of the recovery.

A cogent analysis of fees awarded in mega, common fund cases, which in the discussion includes settlements over $100 million, is found in *In re NASDAQ Market–Makers Antitrust Litigation,* 187 F.R.D. 465 (S.D.N.Y.1998). See *id.* at 486. In *NASDAQ* the court approved a $1.027 billion settlement of a class antitrust action. Class counsel sought fees representing only 17.5% of the settlement. *Id.* at 470, 486. The court concluded that the percentage method, rather than the lodestar method, was appropriate for fixing counsel's fees in mega common fund cases because it aligned the interests of the attorneys and the parties. *Id.* at 482–485. After observing that fees in the range of 6 – 10% are common in mega fund cases reflecting economies of scale, and after concluding from a five factor analysis that an upward adjustment from the benchmark was warranted, the court approved a 14% fee. *Id.* at 485–488. The five factors setting attorney fee awards identified as relevant in the NASDAQ case were: "(1) the amount of work done; (2) the risk incurred; (3) the difficulty or complexity of the case; (4) the benefit to the class; and (5) the benefit to the public." *Id.* at 487.

Attached to Fidelity's memorandum is a list of 29 cases with recoveries of $50 million or more where the attorneys' fees ranged from $1.0 to $46.7 million. Fidelity argues that these cases illustrate the appropriate range of attorney fee awards for mega cases. The fees in many of these cases, however, were determined in whole or in part by consideration of a lodestar analysis, which would tend to depress the contingency fee award percentage. Even Fidelity's list, however, is not compelling support for limiting Snyder, Weiner's fee to 10% as Fidelity advocates, because the fees in four cases were at least 25%. That the size of the recovery alone does not compel a small contingency is illustrated by the recent mega, mega settlements among the tobacco companies and the States. The attorney fee awards were made by the Tobacco Fee Arbitration Panels that were authorized by the settlements. Applying a success multiplier to a base 10% contingency fee, the panels awarded attorneys' fees in the lead cases that exceeded $1.0 billion in each case. These fee awards were 26% of the recovery in the Florida case, 19% in the Texas case, and 35% in the Mississippi case. Tobacco Fee Arbitration Panel Press Release, December 11, 1998.

If the court was to determine a fee award for Snyder, Weiner in the first instance, after the fact, under *NASDAQ*

standards, for reasons previously articulated in discussing similar criteria in Rule 1.5(a) of the Maryland Rules of Professional Conduct, the court would be inclined to award a fee in the upper range of the mega settlement cases. As to the first factor of amount of work done, the court would consider not only the number of hours expended, but also the high productivity of Snyder, Weiner's hours of service. The court is not, however, called upon to determine Snyder, Weiner's fee out of whole cloth. Snyder, Weiner's court approved contingency agreement with the Trustee determines the fee.

The common fund mega recovery analysis is not the proper basis for a fee award in this case. In section 330 and its legislative history Congress expressed its intent that compensation in bankruptcy matters be commensurate with fees awarded for comparable services in non-bankruptcy cases. 11 U.S.C. § 330; H.R.Rep. No. 595, 95th Cong., 2d Sess. 329–30 (1978), reprinted in U.S.C.C.A.N. 5963, 6286. In keeping with this intent bankruptcy courts have attempted to determine the applicability of fee-shifting or common fund precedent to fee issues in bankruptcy.[3]

■■■ The present matter is not a fee shifting case, because there is no statutory provision authorizing the prevailing plaintiff to recover attorneys' fees from the defendant. Greater analogy is found between the instant matter and common fund cases.[4] Here, as in common fund cases, the efforts of Snyder, Weiner were directly responsible for the creation of a pool of money benefitting an identifiable group of non-clients, and the costs of the litigation can be shifted accurately to those who will profit from it.

Conceptually, there are two types of common fund cases, as described by Professor Hazard. First, there are those cases where there is a party with a legal position who is acting for ultimate beneficiaries, such as in an insurance company liquidation where a state official or a court appointed receiver is the liquidator. Those in the class of beneficiaries have a legal right to the common fund, and there is generally no need to engage counsel on a contingency basis. In such cases, attorneys are retained on an hourly basis. The fee is determined by a retention agreement, often approved in advance by the court. This type of common fund case is comparable to a routine bankruptcy case under Chapter 7 where counsel is retained to provide services to facilitate administration of the bankruptcy estate.

Second, there are class action cases (and some stockholder actions) where, in modern practice, the lawyer is self-nominating, and the lawyer selects the plaintiff. In these cases, the lawyer's efforts create the fund for a class of beneficiaries that was not involved in selecting either the lawyer or the cause of action. Settlements of this type of action generally involve the type of mega cases that are the subject of Fidelity's examples and the range for attorneys' fees discussed in *NASDAQ*. In these cases courts have appropriately recognized a duty to consider *de novo* whether the lawyer's self-determined contingency fee is fair as part of its obligation to approve a settlement. See Fed.R.Civ.P. 23(e).

In *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), the Supreme Court defined when attorneys may receive their fee from a class action common fund. The Court noted that it has consistently recognized that a lawyer who recovers a common fund for

---

**3.** See *In the Matter of UNR Industries, Inc.*, 986 F.2d 207 (7th Cir.1993); *In re Apex Oil Co.*, 960 F.2d 728, 731–32 (8th Cir.1992); *In re Manoa Finance Co., Inc.*, 853 F.2d 687 (9th Cir.1988).

**4.** Under a well-established equity rule, costs may be paid out of a fund when many persons have a common interest therein, and one of them at his own costs and expense, brings a suit for its preservation or administration. 20 Am.Jur.2d § 33 (1995). This phenomenon is what defines a common fund case.

the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The Court stated that the doctrine,

> .... rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

*Boeing,* 444 U.S. at 478, 100 S.Ct. 745 (citations omitted).

It is the rationale for the common fund doctrine that illustrates why the common fund doctrine is not controlling here. The Supreme Court in *Mills v. Electric Auto–Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), stated the following in allowing attorneys' fees from a class fund created by the shareholder litigators: "To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Id.* at 392, 90 S.Ct. 616. Similarly, the Fourth Circuit Court of Appeals discussed the function of the doctrine in *U.S. v. Tobias,* 935 F.2d 666 (4th Cir. 1991):

> [The common fund doctrine] is founded upon the principle that when one who, while establishing his own claim, also establishes the means by which others may collect their claims, a chancellor in equity may award counsel fees to the trail blazer out of the property made available for the satisfaction of all claims. The principle is applied so that the one who led in hewing the path to victory is not left saddled with extensive attorney's fees, which need not be incurred by his more timid fellows who held back until the fruits of the pioneer's success were laid before them.

*Id.* at 668 (citing) *Gibbs v. Blackwelder,* 346 F.2d 943, 945 (4th Cir.1965).

The stated purpose for the common fund doctrine illuminates the distinction between the instant case and class action, common fund cases. Here, the entities who benefit from the Ernst & Young settlement knowingly consented to Snyder, Weiner's representation of the estate at a 40% contingency rate. Further, under the original retention agreement, the creditor-beneficiaries agreed to an arrangement (later modified) by which the bankruptcy estate would pay $500,000 of the first one million dollars worth of litigation expenses and 100% thereafter. Therefore, the beneficiaries here, unlike the 'free-riders' envisioned in the common fund doctrine, were willing to bear part of the cost of the litigation from the outset. There is no risk here that there are beneficiaries who benefit at the expense of others. Because the scepter of unjust enrichment is noticeably absent from the present case, it is inappropriate to invoke the common fund doctrine to undertake a *de novo* determination of the reasonableness of the requested contingent fee.

Snyder, Weiner's contingency fee agreement was approved by the court, after notice and an opportunity to object, as reasonable. This preapproval is a procedure specifically provided by the Bankruptcy Code that is both a protection for creditors and potential class beneficiaries of the bankruptcy estate and an inducement for qualified professionals to represent the bankruptcy estate by protecting the benefits of their fee agreements. See 11 U.S.C. § 328(a). A contingent fee agreement is one contemplated option for preapproval; and once a contingency fee agreement is properly preapproved under 11 U.S.C. § 328(a), the fee produced thereby is no longer subject to a lodestar analysis or an after the fact, *de novo,* determination of reasonableness. Rather, the only appropriate review is whether the terms and conditions of the contingent fee agreement have proved to be improvident because of subsequent developments not capable of being anticipated when the contingent fee agreement was approved. No such developments are present here.

## IV. Conclusion.

Snyder, Weiner's 40% contingency fee agreement was approved in advance as reasonable under 11 U.S.C. § 328(a). The Trustee diligently fulfilled her fiduciary duty in soliciting and negotiating the agreement. There have been no developments not capable of being anticipated when the agreement was approved that make the agreement improvident. The litigation was unprecedented, and the result was extraordinary and beneficial to the bankruptcy estate. The testimony at the hearing on approval of Snyder, Weiner's fee application elaborated on the circumstances of this representation and confirmed to the court that its approval of the 40% contingent fee agreement was reasonable. A *de novo* reasonable fee determination and lodestar analysis of what fee should be awarded to Snyder, Weiner are neither required nor appropriate, given the facts of this case. As a matter of public policy, the Trustee should be allowed to honor Snyder, Weiner's contingency fee agreement; and the requested fee is authorized under 11 U.S.C. § 328(a). Therefore, Snyder, Weiner will be awarded its requested fee in the amount of $71.2 million for professional services as special litigation counsel for the Chapter 7 Trustee.